# UNITED STATES *v.* RUSSELL

No. 71–1585.  Argued February 27, 1973—Decided April 24, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 436. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 439.

*Deputy Solicitor General Lacovara* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Petersen, Edward R. Korman, Jerome M. Feit,* and *Roger A. Pauley.*

*Thomas H. S. Brucker,* by appointment of the Court, 409 U. S. 946, argued the cause for respondent. With him on the brief was *Robert E. Prince.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Richard Russell was charged in three counts of a five-count indictment returned against him and codefendants John and Patrick Connolly.[1] After a jury trial in the District Court, in which his sole defense was entrapment, respondent was convicted on all three counts of having unlawfully manufactured and processed methamphetamine ("speed") and of having unlawfully sold and delivered that drug in violation of 21 U. S. C. §§ 331 (q)(1), (2), 360a (a), (b) (1964 ed., Supp. V). He was sentenced to concurrent terms of two years in prison for each offense, the terms to be suspended on the condition that he spend six months in prison and be placed on probation for the following three years. On appeal, the United States Court of Appeals for the Ninth Circuit, one judge dissenting, reversed the conviction solely for the reason that an undercover agent supplied an essential chemical for manufacturing the methamphetamine which formed the basis of respondent's conviction. The court concluded that as a matter of law "a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise." 459 F. 2d 671, 673 (1972). We granted

---

*Paul G. Chevigny* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] John Connolly did not appear for trial. Patrick Connolly was tried with the respondent and found guilty of all five counts against him. The validity of his conviction is not before us in this proceeding.

certiorari, 409 U. S. 911 (1972), and now reverse that judgment.

There is little dispute concerning the essential facts in this case. On December 7, 1969, Joe Shapiro, an undercover agent for the Federal Bureau of Narcotics and Dangerous Drugs, went to respondent's home on Whidbey Island in the State of Washington where he met with respondent and his two codefendants, John and Patrick Connolly. Shapiro's assignment was to locate a laboratory where it was believed that methamphetamine was being manufactured illicitly. He told the respondent and the Connollys that he represented an organization in the Pacific Northwest that was interested in controlling the manufacture and distribution of methamphetamine. He then made an offer to supply the defendants with the chemical phenyl-2-propanone, an essential ingredient in the manufacture of methamphetamine, in return for one-half of the drug produced. This offer was made on the condition that Agent Shapiro be shown a sample of the drug which they were making and the laboratory where it was being produced.

During the conversation, Patrick Connolly revealed that he had been making the drug since May 1969 and since then had produced three pounds of it.[2] John Connolly gave the agent a bag containing a quantity of methamphetamine that he represented as being from "the last batch that we made." Shortly thereafter, Shapiro and Patrick Connolly left respondent's house to view the laboratory which was located in the Connolly house on Whidbey Island. At the house, Shapiro observed an empty bottle bearing the chemical label phenyl-2-propanone.

---

[2] At trial Patrick Connolly admitted making this statement to Agent Shapiro but asserted that the statement was not true.

By prearrangement, Shapiro returned to the Connolly house on December 9, 1969, to supply 100 grams of propanone and observe the manufacturing process. When he arrived he observed Patrick Connolly and the respondent cutting up pieces of aluminum foil and placing them in a large flask. There was testimony that some of the foil pieces accidentally fell on the floor and were picked up by the respondent and Shapiro and put into the flask.[3] Thereafter, Patrick Connolly added all of the necessary chemicals, including the propanone brought by Shapiro, to make two batches of methamphetamine. The manufacturing process having been completed the following morning, Shapiro was given one-half of the drug and respondent kept the remainder. Shapiro offered to buy, and the respondent agreed to sell, part of the remainder for $60.

About a month later, Shapiro returned to the Connolly house and met with Patrick Connolly to ask if he was still interested in their "business arrangement." Connolly replied that he was interested but that he had recently obtained two additional bottles of phenyl-2-propanone and would not be finished with them for a couple of days. He provided some additional methamphetamine to Shapiro at that time. Three days later Shapiro returned to the Connolly house with a search warrant and, among other items, seized an empty 500-gram bottle of propanone and a 100-gram bottle, not the one he had provided, that was partially filled with the chemical.

There was testimony at the trial of respondent and Patrick Connolly that phenyl-2-propanone was generally difficult to obtain. At the request of the Bureau of

---

[3] Agent Shapiro did not otherwise participate in the manufacture of the drug or direct any of the work.

Narcotics and Dangerous Drugs, some chemical supply firms had voluntarily ceased selling the chemical.

At the close of the evidence, and after receiving the District Judge's standard entrapment instruction,[4] the jury found the respondent guilty on all counts charged. On appeal, the respondent conceded that the jury could have found him predisposed to commit the offenses, 459 F. 2d, at 672, but argued that on the facts presented there was entrapment as a matter of law. The Court of Appeals agreed, although it did not find the District Court had misconstrued or misapplied the traditional standards governing the entrapment defense. Rather, the court in effect expanded the traditional notion of entrapment, which focuses on the predisposition of the defendant, to mandate dismissal of a criminal prosecution whenever the court determines that there has been "an intolerable degree of governmental participation in the criminal enterprise." In this case the court decided that the conduct of the agent in supplying a scarce ingredient essential for the manufacture of a controlled substance established that defense.

This new defense was held to rest on either of two alternative theories. One theory is based on two lower court decisions which have found entrapment, regardless of predisposition, whenever the government supplies contraband to the defendants. *United States* v. *Bueno*, 447

---

[4] The District Judge stated the governing law on entrapment as follows: "Where a person already has the willingness and the readiness to break the law, the mere fact that the government agent provides what appears to be a favorable opportunity is not entrapment." He then instructed the jury to acquit respondent if it had a "reasonable doubt whether the defendant had the previous intent or purpose to commit the offense . . . and did so only because he was induced or persuaded by some officer or agent of the government." No exception was taken by respondent to this instruction.

F. 2d 903 (CA5 1971); *United States* v. *Chisum,* 312 F. Supp. 1307 (CD Cal. 1970). The second theory, a nonentrapment rationale, is based on a recent Ninth Circuit decision that reversed a conviction because a government investigator was so enmeshed in the criminal activity that the prosecution of the defendants was held to be repugnant to the American criminal justice system. *Greene* v. *United States,* 454 F. 2d 783 (CA9 1971). The court below held that these two rationales constitute the same defense, and that only the label distinguishes them. In any event, it held that "[b]oth theories are premised on fundamental concepts of due process and evince the reluctance of the judiciary to countenance 'overzealous law enforcement.'" 459 F. 2d, at 674, quoting *Sherman* v. *United States,* 356 U. S. 369, 381 (1958) (Frankfurter, J., concurring in result).

This Court first recognized and applied the entrapment defense in *Sorrells* v. *United States,* 287 U. S. 435 (1932).[5] In *Sorrells,* a federal prohibition agent visited the defendant while posing as a tourist and engaged him in conversation about their common war experiences. After gaining the defendant's confidence, the agent asked for some liquor, was twice refused, but upon asking a third time the defendant finally capitulated, and was subsequently prosecuted for violating the National Prohibition Act.

Mr. Chief Justice Hughes, speaking for the Court, held that as a matter of statutory construction the defense of entrapment should have been available to the defendant. Under the theory propounded by the Chief Justice, the entrapment defense prohibits law enforcement officers from instigating a criminal act by persons "otherwise in-

---

[5] The first case to recognize and sustain a claim of entrapment by government officers as a defense was apparently *Woo Wai* v. *United States,* 223 F. 412 (CA9 1915).

nocent in order to lure them to its commission and to punish them." 287 U. S., at 448. Thus, the thrust of the entrapment defense was held to focus on the intent or predisposition of the defendant to commit the crime. "[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Id.,* at 451.

Mr. Justice Roberts concurred but was of the view "that courts must be closed to the trial of a crime instigated by the government's own agents." *Id.,* at 459.[6] The difference in the view of the majority and the concurring opinions is that in the former the inquiry focuses on the predisposition of the defendant, whereas in the latter the inquiry focuses on whether the government "instigated the crime."

In 1958 the Court again considered the theory underlying the entrapment defense and expressly reaffirmed the view expressed by the *Sorrells* majority. *Sherman v. United States, supra.* In *Sherman* the defendant was convicted of selling narcotics to a Government informer. As in *Sorrells,* it appears that the Government agent gained the confidence of the defendant and, despite initial reluctance, the defendant finally acceded to the repeated importunings of the agent to commit the criminal act. On the basis of *Sorrells,* this Court reversed the affirmance of the defendant's conviction.

In affirming the theory underlying *Sorrells,* Mr. Chief Justice Warren for the Court, held that "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." 356 U. S., at 372. Mr. Justice Frankfurter stated in an opinion concurring

---

[6] Justices Brandeis and Stone concurred in this analysis.

in the result that he believed Mr. Justice Roberts had the better view in *Sorrells* and would have framed the question to be asked in an entrapment defense in terms of "whether the police conduct revealed in the particular case falls below standards . . . for the proper use of governmental power." *Id.,* at 382.[7]

In the instant case, respondent asks us to reconsider the theory of the entrapment defense as it is set forth in the majority opinions in *Sorrells* and *Sherman.* His principal contention is that the defense should rest on constitutional grounds. He argues that the level of Shapiro's involvement in the manufacture of the methamphetamine was so high that a criminal prosecution for the drug's manufacture violates the fundamental principles of due process. The respondent contends that the same factors that led this Court to apply the exclusionary rule to illegal searches and seizures, *Weeks* v. *United States,* 232 U. S. 383 (1914); *Mapp* v. *Ohio,* 367 U. S. 643 (1961), and confessions, *Miranda* v. *Arizona,* 384 U. S. 436 (1966), should be considered here. But he would have the Court go further in deterring undesirable official conduct by requiring that any prosecution be barred absolutely because of the police involvement in criminal activity. The analogy is imperfect in any event, for the principal reason behind the adoption of the exclusionary rule was the Government's "failure to observe its own laws." *Mapp* v. *Ohio, supra,* at 659. Unlike the situations giving rise to the holdings in *Mapp* and *Miranda,* the Government's conduct here violated no independent constitutional right of the respondent. Nor did Shapiro violate any federal statute or rule or commit any crime in infiltrating the respondent's drug enterprise.

---

[7] Justices DOUGLAS, Harlan, and BRENNAN shared the views of entrapment expressed in the Frankfurter opinion.

Respondent would overcome this basic weakness in his analogy to the exclusionary rule cases by having the Court adopt a rigid constitutional rule that would preclude any prosecution when it is shown that the criminal conduct would not have been possible had not an undercover agent "supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels." Even if we were to surmount the difficulties attending the notion that due process of law can be embodied in fixed rules, and those attending respondent's particular formulation, the rule he proposes would not appear to be of significant benefit to him. For, on the record presented, it appears that he cannot fit within the terms of the very rule he proposes.[8]

The record discloses that although the propanone was difficult to obtain, it was by no means impossible. The defendants admitted making the drug both before and after those batches made with the propanone supplied by Shapiro. Shapiro testified that he saw an empty bottle labeled phenyl-2-propanone on his first visit to the laboratory on December 7, 1969. And when the laboratory was searched pursuant to a search warrant on January 10, 1970, two additional bottles labeled phenyl-2-propanone were seized. Thus, the facts in the record amply demonstrate that the propanone used in the illicit manufacture of methamphetamine not only *could* have been obtained without the intervention of Shapiro but was in fact obtained by these defendants.

While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to

---

[8] The language quoted above first appeared in the Government's brief at 32, but was subsequently adopted by the respondent. Brief for Respondent 20–21.

obtain a conviction, cf. *Rochin* v. *California*, 342 U. S. 165 (1952), the instant case is distinctly not of that breed. Shapiro's contribution of propanone to the criminal enterprise already in process was scarcely objectionable. The chemical is by itself a harmless substance and its possession is legal. While the Government may have been seeking to make it more difficult for drug rings, such as that of which respondent was a member, to obtain the chemical, the evidence described above shows that it nonetheless was obtainable. The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment. *Kinsella* v. *United States ex rel. Singleton,* 361 U. S. 234, 246 (1960).

The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice," *Kinsella, supra.*

Respondent also urges, as an alternative to his constitutional argument, that we broaden the nonconstitu-

tional defense of entrapment in order to sustain the judgment of the Court of Appeals. This Court's opinions in *Sorrells* v. *United States,* '*supra,* and *Sherman* v. *United States, supra,* held that the principal element in the defense of entrapment was the defendant's predisposition to commit the crime. Respondent conceded in the Court of Appeals, as well he might, "that he may have harbored a predisposition to commit the charged offenses." 459 F. 2d, at 672. Yet he argues that the jury's refusal to find entrapment under the charge submitted to it by the trial court should be overturned and the views of Justices Roberts and Frankfurter, in *Sorrells* and *Sherman,* respectively, which make the essential element of the defense turn on the type and degree of governmental conduct, be adopted as the law.

We decline to overrule these cases. *Sorrells* is a precedent of long standing that has already been once reexamined in *Sherman* and implicitly there reaffirmed. Since the defense is not of a constitutional dimension, Congress may address itself to the question and adopt any substantive definition of the defense that it may find desirable.[9]

Critics of the rule laid down in *Sorrells* and *Sherman* have suggested that its basis in the implied intent of Congress is largely fictitious, and have pointed to what they conceive to be the anomalous difference between the treatment of a defendant who is solicited by a private individual and one who is entrapped by a government agent. Questions have been likewise raised as to whether "predisposition" can be factually established with the requisite degree of certainty. Arguments such as these, while not devoid of appeal, have been twice

---

[9] A bill currently before the Congress contemplates an express statutory formulation of the entrapment defense. S. 1, 93d Cong., 1st Sess., § 1–3B2 (1973).

previously made to this Court, and twice rejected by it, first in *Sorrells* and then in *Sherman*.

We believe that at least equally cogent criticism has been made of the concurring views in these cases. Commenting in *Sherman* on Mr. Justice Roberts' position in *Sorrells* that "although the defendant could claim that the Government had induced him to commit the crime, the Government could not reply by showing that the defendant's criminal conduct was due to his own readiness and not to the persuasion of government agents," *Sherman* v. *United States*, 356 U. S., at 376–377, Mr. Chief Justice Warren quoted the observation of Judge Learned Hand in an earlier stage of that proceeding:

> " 'Indeed, it would seem probable that, if there were no reply [to the claim of inducement], it would be impossible ever to secure convictions of any offences which consist of transactions that are carried on in secret.' *United States* v. *Sherman*, 200 F. 2d 880, 882." *Sherman* v. *United States*, 356 U. S., at 377 n. 7.

Nor does it seem particularly desirable for the law to grant complete immunity from prosecution to one who himself planned to commit a crime, and then committed it, simply because government undercover agents subjected him to inducements which might have seduced a hypothetical individual who was not so predisposed. We are content to leave the matter where it was left by the Court in *Sherman*:

> "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, 'A different question is presented when the criminal design origi-

nates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.' " *Id.*, at 372, quoting *Sorrells* v. *United States,* 287 U. S., at 442.

Several decisions of the United States district courts and courts of appeals have undoubtedly gone beyond this Court's opinions in *Sorrells* and *Sherman* in order to bar prosecutions because of what they thought to be, for want of a better term, "overzealous law enforcement." But the defense of entrapment enunciated in those opinions was not intended to give the federal judiciary a "chancellor's foot" veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations. We think that the decision of the Court of Appeals in this case quite unnecessarily introduces an unmanageably subjective standard which is contrary to the holdings of this Court in *Sorrells* and *Sherman.*

Those cases establish that entrapment is a relatively limited defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government.

*Sorrells* and *Sherman* both recognize "that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution," 287 U. S., at 441; 356 U. S., at 372. Nor will the mere fact of

deceit defeat a prosecution, see, *e. g.*, *Lewis* v. *United States*, 385 U. S. 206, 208–209 (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.

Respondent's concession in the Court of Appeals that the jury finding as to predisposition was supported by the evidence is, therefore, fatal to his claim of entrapment. He was an active participant in an illegal drug manufacturing enterprise which began before the Government agent appeared on the scene, and continued after the Government agent had left the scene. He was, in the words of *Sherman, supra,* not an "unwary innocent" but an "unwary criminal." The Court of Appeals was wrong, we believe, when it sought to broaden the principle laid down in *Sorrells* and *Sherman.* Its judgment is therefore

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

A federal agent supplied the accused with one chemical ingredient of the drug known as methamphetamine ("speed") which the accused manufactured and for which act he was sentenced to prison. His defense was entrapment, which the Court of Appeals sustained and which the Court today disallows. Since I have an opposed view of entrapment, I dissent.

My view is that of Mr. Justice Brandeis expressed in *Casey* v. *United States,* 276 U. S. 413, 421 (dissent), that of Mr. Justice Frankfurter stated in *Sherman* v. *United States,* 356 U. S. 369, 378 (concurring in result), and that of Mr. Justice Roberts contained in *Sorrells* v. *United States,* 287 U. S. 435, 453 (concurrence).

In my view, the fact that the chemical ingredient supplied by the federal agent might have been obtained from other sources is quite irrelevant. Supplying the chemical ingredient used in the manufacture of this batch of "speed" made the United States an active participant in the unlawful activity. As stated by Mr. Justice Brandeis, dissenting in *Casey* v. *United States, supra,* at 423:

> "I am aware that courts—mistaking relative social values and forgetting that a desirable end cannot justify foul means—have, in their zeal to punish, sanctioned the use of evidence obtained through criminal violation of property and personal rights or by other practices of detectives even more revolting. But the objection here is of a different nature. It does not rest merely upon the character of the evidence or upon the fact that the evidence was illegally obtained. The obstacle to the prosecution lies in the fact that the alleged crime was instigated by officers of the Government; that the act for which the Government seeks to punish the defendant is the fruit of their criminal conspiracy to induce its commission. The Government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature."

Mr. Justice Frankfurter stated the same philosophy in *Sherman* v. *United States, supra,* at 382–383: "No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society." And he added: "The power of government is abused and directed to an end for which it was

not constituted when employed to promote rather than detect crime . . . ." *Id.,* at 384.

Mr. Justice Roberts in *Sorrells* put the idea in the following words:

> "The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy." 287 U. S., at 459.

May the federal agent supply the counterfeiter with the kind of paper or ink that he needs in order to get a quick and easy arrest? The Court of Appeals in *Greene* v. *United States,* 454 F. 2d 783, speaking through Judges Hamley and Hufstedler, said "no" in a case where the federal agent treated the suspects "as partners" with him, offered to supply them with a still, a still site, still equipment, and an operator and supplied them with sugar. *Id.,* at 786.

The Court of Appeals in *United States* v. *Bueno,* 447 F. 2d 903, speaking through Judges Roney, Coleman, and Simpson, held that where an informer purchased heroin for the accused who in turn sold it to a federal agent, there was entrapment because the sale was made "through the creative activity of the government." *Id.,* at 906.

In *United States* v. *Chisum,* 312 F. Supp. 1307, the federal agent supplied the accused with the counterfeit money, the receipt of which was the charge against him. Judge Ferguson sustained the defense of entrapment saying, "When the government supplies the contraband, the receipt of which is illegal, the government cannot be permitted to punish the one receiving it." *Id.,* at 1312.

The Court of Appeals in the instant case relied upon this line of decisions in sustaining the defense of entrapment, 459 F. 2d 671. In doing so it took the view that the "prostitution of the criminal law," as Mr. Justice Roberts described it in *Sorrells*, 287 U. S., at 457, was the evil at which the defense of entrapment is aimed.

Federal agents play a debased role when they become the instigators of the crime, or partners in its commission, or the creative brain behind the illegal scheme. That is what the federal agent did here when he furnished the accused with one of the chemical ingredients needed to manufacture the unlawful drug.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

It is common ground that "[t]he conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents." *Lopez* v. *United States,* 373 U. S. 427, 434 (1963). For the Government cannot be permitted to instigate the commission of a criminal offense in order to prosecute someone for committing it. *Sherman* v. *United States,* 356 U. S. 369, 372 (1958). As Mr. Justice Brandeis put it, the Government "may not provoke or create a crime and then punish the criminal, its creature." *Casey* v. *United States,* 276 U. S. 413, 423 (1928) (dissenting opinion). It is to prevent this situation from occurring in the administration of federal criminal justice that the defense of entrapment exists. *Sorrells* v. *United States,* 287 U. S. 435 (1932); *Sherman* v. *United States, supra.* Cf. *Masciale* v. *United States,* 356 U. S. 386 (1958); *Lopez* v. *United States, supra.* But the Court has been sharply divided as to the proper basis, scope, and focus of the entrapment defense, and

as to whether, in the absence of a conclusive showing, the issue of entrapment is for the judge or the jury to determine.

## I

In *Sorrells* v. *United States, supra,* and *Sherman* v. *United States, supra,* the Court took what might be called a "subjective" approach to the defense of entrapment. In that view, the defense is predicated on an unexpressed intent of Congress to exclude from its criminal statutes the prosecution and conviction of persons, "otherwise innocent," who have been lured to the commission of the prohibited act through the Government's instigation. *Sorrells* v. *United States, supra,* at 448. The key phrase in this formulation is "otherwise innocent," for the entrapment defense is available under this approach only to those who would not have committed the crime but for the Government's inducements. Thus, the subjective approach focuses on the conduct and propensities of the particular defendant in each individual case: if he is "otherwise innocent," he may avail himself of the defense; but if he had the "predisposition" to commit the crime, or if the "criminal design" originated with him, then—regardless of the nature and extent of the Government's participation—there has been no entrapment. *Id.,* at 451. And, in the absence of a conclusive showing one way or the other, the question of the defendant's "predisposition" to the crime is a question of fact for the jury. The Court today adheres to this approach.

The concurring opinion of Mr. Justice Roberts, joined by Justices Brandeis and Stone, in the *Sorrells* case, and that of Mr. Justice Frankfurter, joined by Justices DOUGLAS, Harlan, and BRENNAN, in the *Sherman* case, took a different view of the entrapment defense. In their concept, the defense is not grounded on some unex-

pressed intent of Congress to exclude from punishment under its statutes those otherwise innocent persons tempted into crime by the Government, but rather on the belief that "the methods employed on behalf of the Government to bring about conviction cannot be countenanced." *Sherman* v. *United States, supra,* at 380. Thus, the focus of this approach is not on the propensities and predisposition of a specific defendant, but on "whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *Id.,* at 382. Phrased another way, the question is whether—regardless of the predisposition to crime of the particular defendant involved—the governmental agents have acted in such a way as is likely to instigate or create a criminal offense. Under this approach, the determination of the lawfulness of the Government's conduct must be made—as it is on all questions involving the legality of law enforcement methods—by the trial judge, not the jury.

In my view, this objective approach to entrapment advanced by the Roberts opinion in *Sorrells* and the Frankfurter opinion in *Sherman* is the only one truly consistent with the underlying rationale of the defense.[1] Indeed, the very basis of the entrapment defense itself demands adherence to an approach that focuses on the conduct of the governmental agents, rather than on whether the defendant was "predisposed" or "otherwise innocent." I find it impossible to believe that the purpose of the defense is to effectuate some unexpressed congressional intent to exclude from its criminal statutes persons who committed a prohibited act, but would not have

---

[1] Both the Proposed New Federal Criminal Code (1971), Final Report of the National Commission on Reform of Federal Criminal Laws § 702, and the American Law Institute's Model Penal Code § 2.13 (Proposed Official Draft, 1962), adopt this objective approach.

done so except for the Government's inducements. For, as Mr. Justice Frankfurter put it, "the only legislative intention that can with any show of reason be extracted from the statute is the intention to make criminal precisely the conduct in which the defendant has engaged." *Sherman* v. *United States, supra,* at 379. See also *Sorrells* v. *United States, supra,* at 456 (Roberts, J., concurring). Since, by definition, the entrapment defense cannot arise unless the defendant actually committed the proscribed act, that defendant is manifestly covered by the terms of the criminal statute involved.

Furthermore, to say that such a defendant is "otherwise innocent" or not "predisposed" to commit the crime is misleading, at best. The very fact that he has committed an act that Congress has determined to be illegal demonstrates conclusively that he is not innocent of the offense. He may not have originated the precise plan or the precise details, but he was "predisposed" in the sense that he has proved to be quite capable of committing the crime. That he was induced, provoked, or tempted to do so by government agents does not make him any more innocent or any less predisposed than he would be if he had been induced, provoked, or tempted by a private person—which, of course, would not entitle him to cry "entrapment." Since the only difference between these situations is the identity of the tempter, it follows that the significant focus must be on the conduct of the government agents, and not on the predisposition of the defendant.

The purpose of the entrapment defense, then, cannot be to protect persons who are "otherwise innocent." Rather, it must be to prohibit unlawful governmental activity in instigating crime. As Mr. Justice Brandeis stated in *Casey* v. *United States, supra,* at 425: "This prosecution should be stopped, not because some right of Casey's has been denied, but in order to protect the

Government. To protect it from illegal conduct of its officers. To preserve the purity of its courts." Cf. *Olmstead* v. *United States*, 277 U. S. 438, 470 (1928) (Holmes, J., dissenting); *id.*, at 485 (Brandeis, J., dissenting). If that is so, then whether the particular defendant was "predisposed" or "otherwise innocent" is irrelevant; and the important question becomes whether the Government's conduct in inducing the crime was beyond judicial toleration.

Moreover, a test that makes the entrapment defense depend on whether the defendant had the requisite predisposition permits the introduction into evidence of all kinds of hearsay, suspicion, and rumor—all of which would be inadmissible in any other context—in order to prove the defendant's predisposition. It allows the prosecution, in offering such proof, to rely on the defendant's bad reputation or past criminal activities, including even rumored activities of which the prosecution may have insufficient evidence to obtain an indictment, and to present the agent's suspicions as to why they chose to tempt this defendant. This sort of evidence is not only unreliable, as the hearsay rule recognizes; but it is also highly prejudicial, especially if the matter is submitted to the jury, for, despite instructions to the contrary, the jury may well consider such evidence as probative not simply of the defendant's predisposition, but of his guilt of the offense with which he stands charged.

More fundamentally, focusing on the defendant's innocence or predisposition has the direct effect of making what is permissible or impermissible police conduct depend upon the past record and propensities of the particular defendant involved. Stated another way, this subjective test means that the Government is permitted to entrap a person with a criminal record or bad reputation, and then to prosecute him for the manufactured

crime, confident that his record or reputation itself will be enough to show that he was predisposed to commit the offense anyway.

Yet, in the words of Mr. Justice Roberts:

> "Whatever may be the demerits of the defendant or his previous infractions of law these will not justify the instigation and creation of a new crime, as a means to reach him and punish him for his past misdemeanors. . . . To say that such conduct by an official of government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction." *Sorrells* v. *United States, supra,* at 458–459.

And as Mr. Justice Frankfurter pointed out:

> "Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. No more does it vary according to the suspicions, reasonable or unreasonable, of the police concerning the defendant's activities." *Sherman* v. *United States, supra,* at 383.

In my view, a person's alleged "predisposition" to crime should not expose him to government participation in the criminal transaction that would be otherwise unlawful.[2]

---

[2] See Donnelly, Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs, 60 Yale L. J. 1091, 1111 (1951):

"Clearly entrapment is a facet of a broader problem. Along with illegal search and seizures, wire tapping, false arrest, illegal detention and the third degree, it is a type of lawless law enforcement. They all spring from common motivations. Each is a substitute for

This does not mean, of course, that the Government's use of undercover activity, strategy, or deception is necessarily unlawful. *Lewis* v. *United States,* 385 U. S. 206, 208–209 (1966). Indeed, many crimes, especially so-called victimless crimes, could not otherwise be detected. Thus, government agents may engage in conduct that is likely, when objectively considered, to afford a person ready and willing to commit the crime an opportunity to do so. *Osborn* v. *United States,* 385 U. S. 323, 331–332 (1966). See also *Sherman* v. *United States, supra,* at 383–384 (Frankfurter, J., concurring).

But when the agents' involvement in criminal activities goes beyond the mere offering of such an opportunity, and when their conduct is of a kind that could induce or instigate the commission of a crime by one not ready and willing to commit it, then—regardless of the character or propensities of the particular person induced— I think entrapment has occurred. For in that situation, the Government has engaged in the impermissible manufacturing of crime, and the federal courts should bar the prosecution in order to preserve the institutional integrity of the system of federal criminal justice.[3]

skillful and scientific investigation. Each is condoned by the sinister sophism that the end, when dealing with known criminals or the 'criminal classes,' justifies the employment of illegal means."

[3] Several federal courts have adopted the objective test advanced by Mr. Justice Roberts and Mr. Justice Frankfurter, or a variant thereof, focusing on the conduct of the government agents, rather than the "predisposition" of the particular defendant. See, *e. g., United States* v. *McGrath,* 468 F. 2d 1027, 1030–1031 (CA7 1972); *Greene* v. *United States,* 454 F. 2d 783, 786–787 (CA9 1971); *Carbajal-Portillo* v. *United States,* 396 F. 2d 944, 948 (CA9 1968); *Smith* v. *United States,* 118 U. S. App. D. C. 38, 44, 46, 331 F. 2d 784, 790, 792 (1964) (*en banc*); *United States* v. *Chisum,* 312 F. Supp. 1307 (CD Cal. 1970). Cf. *United States* v. *Morrison,* 348 F. 2d 1003, 1004 (CA2 1965); *Accardi* v. *United States,* 257 F. 2d 168, 172–173, n. 5 (CA5 1958); *United States* v. *Kros,* 296 F. Supp. 972, 979 (ED Pa. 1969). Moreover, this objective approach is the one

## II

In the case before us, I think that the District Court erred in submitting the issue of entrapment to the jury, with instructions to acquit only if it had a reasonable doubt as to the respondent's predisposition to committing the crime. Since, under the objective test of entrapment, predisposition is irrelevant and the issue is to be decided by the trial judge, the Court of Appeals, I believe, would have been justified in reversing the conviction on this basis alone. But since the appellate court did not remand for consideration of the issue by the District Judge under an objective standard, but rather found entrapment as a matter of law and directed that the indictment be dismissed, we must reach the merits of the respondent's entrapment defense.

Since, in my view, it does not matter whether the respondent was predisposed to commit the offense of which he was convicted, the focus must be, rather, on the conduct of the undercover government agent. What the agent did here was to meet with a group of suspected producers of methamphetamine, including the respondent; to request the drug; to offer to supply the chemical phenyl-2-propanone in exchange for one-half of the methamphetamine to be manufactured therewith; and, when that offer was accepted, to provide the needed chemical ingredient, and to purchase some of the drug from the respondent.

favored by a majority of the commentators. In addition to the Proposed New Federal Criminal Code and the Model Penal Code, *supra*, n. 1, see Williams, The Defense of Entrapment and Related Problems in Criminal Prosecution, 28 Fordham L. Rev. 399 (1959); Cowen, The Entrapment Doctrine in the Federal Courts, and Some State Court Comparisons, 49 J. Crim. L. C. & P. S. 447 (1959); Donnelly, *supra*, n. 2; Comment, Entrapment in the Federal Courts, 1 U. San Francisco L. Rev. 177 (1966).

It is undisputed that phenyl-2-propanone is an essential ingredient in the manufacture of methamphetamine; that it is not used for any other purpose; and that, while its sale is not illegal, it is difficult to obtain, because a manufacturer's license is needed to purchase it, and because many suppliers, at the request of the Federal Bureau of Narcotics and Dangerous Drugs, do not sell it at all. It is also undisputed that the methamphetamine which the respondent was prosecuted for manufacturing and selling was all produced on December 10, 1969, and that all the phenyl-2-propanone used in the manufacture of that batch of the drug was provided by the government agent. In these circumstances, the agent's undertaking to supply this ingredient to the respondent, thus making it possible for the Government to prosecute him for manufacturing an illicit drug with it, was, I think, precisely the type of governmental conduct that the entrapment defense is meant to prevent.

Although the Court of Appeals found that the phenyl-2-propanone could not have been obtained without the agent's intervention—that "there could not have been the manufacture, delivery, or sale of the illicit drug had it not been for the Government's supply of one of the essential ingredients," 459 F. 2d 671, 672—the Court today rejects this finding as contradicted by the facts revealed at trial. The record, as the Court states, discloses that one of the respondent's accomplices, though not the respondent himself, had obtained phenyl-2-propanone from independent sources both before and after receiving the agent's supply, and had used it in the production of methamphetamine. This demonstrates, it is said, that the chemical was obtainable other than through the government agent; and hence the agent's furnishing it for the production of the methamphetamine involved in this prosecution did no more than afford

an opportunity for its production to one ready and willing to produce it. Cf. *Osborn* v. *United States, supra,* at 331–332. Thus, the argument seems to be, there was no entrapment here, any more than there would have been if the agent had furnished common table salt, had that been necessary to the drug's production.

It cannot be doubted that if phenyl-2-propanone had been wholly unobtainable from other sources, the agent's undercover offer to supply it to the respondent in return for part of the illicit methamphetamine produced therewith—an offer initiated and carried out by the agent for the purpose of prosecuting the respondent for producing methamphetamine—would be precisely the type of governmental conduct that constitutes entrapment under any definition. For the agent's conduct in that situation would make possible the commission of an otherwise totally impossible crime, and, I should suppose, would thus be a textbook example of instigating the commission of a criminal offense in order to prosecute someone for committing it.

But assuming in this case that the phenyl-2-propanone was obtainable through independent sources, the fact remains that that used for the particular batch of methamphetamine involved in all three counts of the indictment with which the respondent was charged—*i. e.,* that produced on December 10, 1969—was supplied by the Government. This essential ingredient was indisputably difficult to obtain, and yet what was used in committing the offenses of which the respondent was convicted was offered to the respondent by the Government agent, on the agent's own initiative, and was readily supplied to the respondent in needed amounts. If the chemical was so easily available elsewhere, then why did not the agent simply wait until the respondent had himself obtained the ingredients and produced the drug, and

then buy it from him? The very fact that the agent felt it incumbent upon him to offer to supply phenyl-2-propanone in return for the drug casts considerable doubt on the theory that the chemical could easily have been procured without the agent's intervention, and that therefore the agent merely afforded an opportunity for the commission of a criminal offense.

In this case, the chemical ingredient was available only to licensed persons, and the Government itself had requested suppliers not to sell that ingredient even to people with a license. Yet the Government agent readily offered, and supplied, that ingredient to an unlicensed person and asked him to make a certain illegal drug with it. The Government then prosecuted that person for making the drug produced *with the very ingredient* which its agent had so helpfully supplied. This strikes me as the very pattern of conduct that should be held to constitute entrapment as a matter of law.[4]

It is the Government's duty to prevent crime, not to promote it. Here, the Government's agent asked that the illegal drug be produced for him, solved his quarry's practical problems with the assurance that he could provide the one essential ingredient that was difficult to obtain, furnished that element as he had promised, and bought the finished product from the respondent—all so that the respondent could be prosecuted for producing and selling the very drug for which the agent had asked and for which he had provided the necessary component.

---

[4] Some federal courts have ordered indictments for receipt, possession, or sale of contraband to be dismissed, upon a showing that Government agents themselves had supplied the contraband. See *United States* v. *McGrath, supra; Greene* v. *United States, supra; United States* v. *Bueno,* 447 F. 2d 903 (CA5 1971); *United States* v. *Chisum, supra; United States* v. *Dillet,* 265 F. Supp. 980 (SDNY 1966). The same considerations obtain here.

Under the objective approach that I would follow, this respondent was entrapped, regardless of his predisposition or "innocence."

In the words of Mr. Justice Roberts:

> "The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy." *Sorrells* v. *United States, supra,* at 459.

I would affirm the judgment of the Court of Appeals.