**UNITED STATES of America,
Appellee,**

v.

**James J. GAROFALO, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Alphonse PATRIZZI, Appellant.**

No. 73–1534, 73–1553.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 11, 1974.

Decided May 7, 1974.

Donald G. Stubbs, and Lloyd F. Dieckman, Kansas City, Mo., for appellants.

Kurt P. Schulke, Sp. Atty., Dept. of Justice, Kansas City, Mo., for appellee.

Before HEANEY and BRIGHT, Circuit Judges, and WANGELIN, District Judge.*

BRIGHT, Circuit Judge.

Alphonse Patrizzi and James J. Garofalo were tried before a jury in the United States District Court for the Western District of Missouri and convicted of: (1) transportation of stolen securities in interstate commerce in violation of 18 U.S.C. § 2314; (2) sale of stolen securities which had been moved in interstate commerce in violation of 18 U.S.C. § 2315; and (3) conspiracy to commit these offenses in violation of 18 U.S.C. § 371.[1]

On this appeal, defendants raise several issues. We have examined the record closely and find no merit whatsoever to their contentions. Messrs. Patrizzi and Garofalo received a preeminently fair trial in which the Government proved defendant-Patrizzi's guilt overwhelmingly and presented a strong case against Garofalo. Only the latter questions the sufficiency of the evidence.

## I.

### PATRIZZI'S APPEAL

Defendant-Patrizzi's sole claim is that his warrantless arrest on August 23, 1972, was without probable cause, and, hence, the incidental search and seizure of incriminating items on his person violated the fourth amendment. He contends that agent Lueckenhoff, the arresting officer, acted solely on the basis of hearsay information from agent Knox, his supervisor, who in turn relied entirely on an informer's false statement that the informer had personally observed stolen securities in the defend-

ant's possession on August 2, 1972. He argues that there can have been no probable cause for the arrest, because it was based on a "tip" which was ultimately proven untrue at trial by the informer's own testimony that he never physically saw the defendant until August 20, 1972.

Although it is quite dubious that the questioned statement was the sole "impelling force" of the arrest as defendant-Patrizzi contends, even assuming that it was, his contention is irrelevant to our inquiry regarding probable cause. He concedes that the facts related in the supervising officer's affidavit attached to the post-arrest complaint form would support a finding of probable cause if true. The discrepancy between what the informer may have told the F.B.I. and what was actually proved at trial may not now be used to invalidate an arrest, absent any showing of fraud or deceit on the part of the law enforcement officials involved. *Cf.* United States v. Marihart, 492 F.2d 897 (8th Cir., 1974). "[P]robable cause is not defeated because an informant is later proved to have lied, as long as the affiant accurately represented what was told him." United States v. Sultan, 463 F.2d 1066, 1070 (2d Cir. 1972). Moreover, an examination of the record does not establish any clear falsity of the affidavit. More probably, the affiant simply made a mistake in attributing facts related to him by the informer who apparently passed on information received from his associate who dealt with the criminals on or about August 2, 1972. The record of the trial does not undercut the conclusion of District Judge Hunter that the arrest and search were valid.[2]

---

* H. KENNETH WANGELIN, District Judge, Eastern and Western District of Missouri, sitting by designation.

1. Two co-defendants—Gerald M. Marshman and Allen I. Kirchick—were granted judgments of acquittal at the close of the prosecution's case for lack of evidence to connect them with the crimes charged.

2. The district court carefully considered this claim after an extended pretrial suppression

hearing and denied Patrizzi any relief. Summarizing his findings regarding the conduct of the arresting officer in a detailed memorandum, Judge Hunter stated:

The Court is convinced that Agent Lueckenhoff has sufficient probable cause to believe that defendant Patrizzi was immediately prior to his arrest engaging in criminal activity. Agent Lueckenhoff had received information through his subordinate agents and through Agent Knox.

## II.

### GAROFALO'S APPEAL

■ Defendant-Garofalo asserts first that the trial court's instruction on the inferences that may be drawn from the possession of "recently stolen" property violated his fifth amendment rights. This circuit has regularly upheld the use of such an instruction, under circumstances similar to those presented here, as a matter that may reasonably be submitted to the jury. *See, e. g.,* Sewell v. United States, 406 F.2d 1289 (8th Cir. 1969). As appellant's counsel concedes, the Ninth Circuit has considered the merits of the fifth amendment argument and rejected it in McAbee v. United States, 434 F.2d 361 (9th Cir. 1970). We agree with the *McAbee* court.

■ Garofalo next contends that the trial court should have held as a matter of law that he was entrapped by the Government. The defense of entrapment focuses on the "predisposition" of the defendant and is properly a matter for the jury. *See* United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L. Ed.2d 366 (1973). It has been said that "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." Sherman v. United States, 356 U. S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958). Under the facts in this case, when that line is drawn, it was proper for the jury to be allowed to determine into which category the luckless Garofalo's circumstances fell.

Finally, Garofalo claims that the evidence was insufficient to support his conviction. The testimony adduced at trial—which we will shortly describe— establishes Garofalo's active involvement in a criminal enterprise with defendant-Patrizzi, who arranged for the transportation and sale of stolen securities.

This information, and the facts known to Agent Lueckenhoff personally at the time of the arrest were such that he could reasonably conclude that defendant Patrizzi had in his presence accomplished a "pass" of stolen securities. See United States v.

■ We take the time to set forth the facts of this case at length not only in order to answer fully Garofalo's insufficiency-of-the-evidence claim, but also because the record unfolds for us a fascinating tale of two hoodlums who were undone when their own gullibility and rapacity met head-on with as neat a bit of undercover detective work as we have seen in a month of Sunday television mystery movies. For those who find satisfaction in detective fiction—which sometimes seems like the only occasion where law almost always triumphs over outlaws—we offer the Runyonesque but true story of this case.

## III.

During the summer of 1972, Irving Richards, an ex-convict employed as a special investigator for a Los Angeles private detective agency, was retained by Fireman's Fund Insurance Company to recover some $700,000 worth of securities which had been stolen from one of its insureds, a New York bank. Richards and an associate, Frank Michaels, also a former small-time hoodlum, advised certain underworld contacts that they had a market for stolen securities through an outlet in Kansas City, Missouri.

These contacts led to long distance telephone conversations with "Al" Patrizzi who was at that time in Boston. Patrizzi advised Richards that he would see what he could do and promised to keep in touch through Michaels. Richards, accompanied by Michaels, then flew to Boston, but was unable to meet personally with Patrizzi who insisted that he would not meet further with Michaels.

After a week of seemingly fruitless negotiations in Boston, Richards again telephoned Patrizzi. "Are you going to do business or not?" he asked, "I am going back to California." But Patrizzi

Stratton, 453 F.2d 36 (8th Cir. 1972). This knowledge was sufficient to establish probable cause for the arrest of Patrizzi, and to justify a search of his person incident to that arrest.

already had risen to the bait. He announced that he would be flying to Kansas City within a few days and that he would be bringing $250,000 worth of securities. According to Richards' testimony, Patrizzi added that, if the deal went through all right, he would try to produce another $700,000 worth of securities. They agreed to meet in Kansas City the next day.

At approximately 8:00 P.M. on the evening of August 20, 1972, Richards and Michaels met Patrizzi and Garofalo in the cocktail lounge of the Holiday Inn in downtown Kansas City. Patrizzi made it clear that successful negotiation of the $250,000 in securities which he then had in his possession was the necessary first step before he would be allowed to bring any more securities from back East. Richards then told Patrizzi his manufactured tale about a bank vice-president who was going to help pass these securities.

This friend, Richards told Patrizzi, controlled the loan board of his bank and could push the securities through as collateral for a loan. According to the story, the banker had invested heavily and lost bank funds in the commodities market. He needed to recoup his investments and was willing to market the securities to cover his losses. After listening to Richards, Patrizzi agreed to a fifty-fifty split after the banker got his share. They arranged for a further meeting the next day to discuss the deal with the banker.

During this entire period, Richards had kept in constant contact with F.B.I. Special Agent Jack Knox of the Kansas City office, notifying him of the progress of the negotiations. Agent Knox had obtained the cooperation of a real banker, Henry Walton, executive vice-president of Livestock National Bank in Kansas City, who had formerly been a deputy sheriff in Johnson County, Kansas. He agreed to help in recovering the stolen securities and apprehending those dealing in the stolen property. That next morning before the meeting scheduled with Patrizzi, Richards met

with Walton and F.B.I. agent Steve Travis, who was to pose as Walton's assistant in the bank. They discussed a strategy to induce Patrizzi to produce all the securities available to him, not merely the $250,000 worth initially offered. Richards warned Walton that Patrizzi was an intelligent man and that Walton better be "on the ball" to put over the deal.

When the meeting adjourned, Richards brought Patrizzi to the Golden Ox Restaurant, located below the Livestock National Bank. Introductions were effected and business began after Walton's posed assistant (F.B.I. agent Travis) departed. Walton explained his predicament, his market losses, and the weight of his debt. He told Patrizzi he wanted to get on with the deal. Patrizzi responded with a promise to produce $250,000 in securities. Walton resisted, stating that he wanted the "big deal." Patrizzi responded first that the $250,000 worth was "front money" necessary to get the "big package."

"I said I wouldn't do that," Walton explained at trial. "My part of—I could only loan about 50 or 60 percent of the amount of the securities, and my part of that at 20 percent of half would not be enough to get me out of debt, and I wouldn't do it for that."

The banker played his part to the hilt. He surged forward with his spiel: "I just said you are going—you can go to hell, I am not going to do it for that little amount. I will do it for the big one. I am only going to do it once, and it is that way or not at all."

Banker-Walton continued his explanation—one big loan might not lead to any prosecution; his bank would probably think Walton had just used bad judgment; he might get fired but not prosecuted; but two deals would be different —the second time the bank might investigate further.

Stunned by Walton's vehement refusal, Patrizzi temporized, saying that he would check and let the banker know. Walton disappeared upstairs to get a

loan application and a collateral receipt form. Impressed by the force of Walton's arguments, Patrizzi turned wonderingly to Richards and remarked, "That is the crookedest banker I ever met."

When Walton returned with the forms that day, he explained to Patrizzi that, since the discount committee met the next day, it would be useful to have a list of the additional securities and serial numbers that Patrizzi would be supplying so that approval of the loan could be prearranged. Patrizzi agreed to do what he could, and the meeting terminated.

The next morning, August 22, 1972, Patrizzi met with Richards and produced a written list of the names, numbers, and maturity dates on the securities. Suddenly, for Richards, the game was over. The paper in his hands that morning carried sad news: they were the wrong securities as far as he was concerned. They were not the securities that belonged to Fireman's Fund. Nevertheless, he went on playing his part, telling Patrizzi he would take the list to the bank. In actuality, he immediately turned it over to the F.B.I.

A short time later in the morning, Richards again met with Patrizzi. The latter was accompanied by Garofalo, who stated that the additional securities would be arriving later on in the afternoon. That afternoon Garofalo, while under F.B.I. surveillance, met Allen Kirchick, an inbound Boston passenger, at the Kansas City airport.[3] Kirchick carried a portfolio, presumably containing the additional securities. He carried no other baggage. He and Garofalo travelled together to the Holiday Inn in Kansas City. At a brief third meeting that night, the first arrangements for the actual exchange were made. On the next morning, Richards and Patrizzi would go to the bank to get the loan proceeds.

On the morning of August 23, 1972, Patrizzi and Richards went to the bank as planned, but Richards explained that Walton had arranged to issue a cashier's check because Walton's small bank lacked the necessary cash on hand. With Patrizzi waiting outside, watching through the glass doors, Richards entered the bank, picked up the cashier's check from Walton's assistant (F.B.I. agent Travis), and held it in the air for Patrizzi to see. Laying the check back down, Richards went outside and told Patrizzi that the check was all made out. Patrizzi said he would return to the hotel and wait in the lobby to exchange the securities for his share of the money.

As soon as Patrizzi was out of sight, Richards and Travis set to work forming a package of cash to falsely represent Patrizzi's full share. They prepared stacks of bills—dollar bills on the inside and one hundred dollar bills on the outside of several stacks of currency. Thus, approximately $3,000 in currency looked like $300,000. Richards and Travis placed this currency in a briefcase, then travelled by cab to another Kansas City bank, in case they were being watched. There Richards called Patrizzi and announced that he and Travis would be at the hotel in five minutes. A meeting in the lobby was arranged.

When Travis and Richards arrived, Patrizzi and Garofalo were waiting. Richards opened his briefcase, exhibiting the money. Patrizzi nodded to Garofalo who handed Richards a briefcase which contained the stolen securities. The transaction itself was rapid and furtive. Immediately after the briefcases were exchanged, the participants wheeled around and departed in different directions. No sooner than Richards and Travis went out the front door, F.B.I. agents who had been quietly observing the exchange darted forward. Patrizzi was arrested as he stepped onto an elevator; Garofalo was arrested as he

3. *See* note 1 *supra.*

walked down a hallway. The trap had been sprung; the criminals were caught red-handed.

## IV.

The evidence shows that Garofalo was privy to the initial discussion of the illegal transaction on August 20, 1972. On the day following Patrizzi's meeting with Walton, Garofalo advised an apparent confederate, Richards, that the additional securities would be arriving that afternoon, and he actually delivered the stolen securities in a briefcase to Richards in the lobby of the Holiday Inn. Based on these key facts, the jury could properly have found him to have been a co-conspirator in the conspiracy count and either a principal or an aider-and-abettor in the substantive counts of the indictment.

Accordingly, we affirm.