THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES ROBERT LAWRENCE, Defendant-Appellant.

Fourth District   No. 4—90—0317

Opinion filed January 31, 1991.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Monroe D. McWard, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Defendant James R. Lawrence was charged and convicted of the offense of unlawful possession with intent to deliver more than 100 grams of a substance containing cocaine, a Class X felony (Ill. Rev. Stat. 1989, ch. 56½, par. 1401), and was sentenced to nine years' imprisonment. Defendant appeals, contending the conduct of the law enforcement officers involved was so outrageous his due process rights were violated. Defendant contends the police sold him a large quantity of cocaine in order to ensure a mandatory minimum penalty of nine years. We affirm.

At the jury trial, James Smith testified he was arrested on August 4, 1989, for possession of nine grams of cocaine. He later agreed to assist the Champaign County Interagency Task Force (Task Force) and provided the name of his supplier, Juan Brown. On September 13, 1989, Smith went to Brown's residence twice with undercover Officer Davis from the Task Force. Brown was not at home either time. On one of these occasions, Smith inadvertently encountered defendant, who was also approaching Brown's home. Defendant told Smith if he was not able to contact Brown, Smith could contact him to be supplied with cocaine. To facilitate the transaction, defendant gave Smith his telephone pager number. Defendant indicated to Smith he sold quite a bit of cocaine but also tried to keep a low profile.

Later on the evening of September 13, Smith went to defendant's residence with Officers Davis and Daniels. Smith's purpose now was to make a controlled buy of cocaine from defendant, and he had been supplied with $120 from the Task Force. When Smith first arrived at defendant's residence, defendant was not home. Smith later returned to the residence and purchased 1.6 grams of cocaine. Smith entered the residence alone while the officers waited in the car.

Two days later, on September 15, Smith again met with members of the Task Force for the purpose of making another controlled buy of cocaine from defendant. However, when contacted, defendant stated he did not have any cocaine to sell, as he was waiting to obtain cocaine himself. The Task Force then changed its plan and decided to see if defendant would be interested in buying cocaine from them.

Smith, again with Officers Davis and Daniels, went to defendant's home. Smith and Davis went to the door while Daniels waited in the car with the cocaine. Jeff Schumacher answered the door and stated defendant was not home. Smith and Davis indicated they would return later. When Smith and Davis returned for the second time, defendant was still not home. They decided to abandon their plan, and the group dispersed. Smith later inadvertently encountered defendant in his car at the intersection of Prospect and Kirby Streets in Champaign. Both cars pulled into a parking lot so the men could converse. Defendant expressed his willingness to purchase five ounces of cocaine for $3,000.

Smith contacted the members of the Task Force, and Smith and Davis again approached defendant's residence. Defendant admitted them into his apartment. After defendant displayed the $3,000 in cash, Davis agreed to go to the car to get the cocaine. Davis came back with the cocaine and handed it to defendant, who gave Davis the currency. Defendant and Schumacher tasted the cocaine and Schuma-

cher went to a back room to weigh it. Davis counted the money and conversed with defendant until the Task Force arrived to place defendant and Schumacher under arrest. During these transactions, Smith was equipped with a sound-recording device, and a tape and transcript were produced of Smith's conversations.

Rantoul police officer Randy Davis testified he was a member of the Task Force. He confirmed his agency was investigating Juan Brown as a suspected drug supplier and James Smith was assisting them in this investigation. Davis corroborated Smith's account of the September 13 cocaine buy from defendant. Davis also corroborated Smith's testimony concerning the events of September 15. Davis admitted defendant had not asked Smith to assist him in obtaining any cocaine.

The testimony of Smith and Davis was corroborated by Officer Troy Daniels and Lieutenant Walter Wolfe. Daniels also executed the search warrant of defendant's home and cataloged the items seized. Wolfe assisted in the execution of the search warrant and also testified regarding his post-arrest conversation with defendant. After advising defendant of his *Miranda* rights, Wolfe informed defendant he was interested in obtaining information about other cocaine sellers. Defendant offered the name of Juan Brown and indicated he had dealings with Brown over the previous six months. Defendant stated he bought an average of six ounces of cocaine per week from Brown. Defendant also told Wolfe he could name other of his own customers.

The defense presented no evidence. Defendant asserted a defense of entrapment. Intertwined with this defense was the argument the government's conduct in selling him a large quantity of cocaine was so outrageous it violated his right to due process. For the purposes of appeal, defendant raises only the due process argument.

The United States Supreme Court acknowledged the potential validity of an outrageousness defense in *United States v. Russell* (1973), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637. In *Russell*, the defendant was convicted of having unlawfully manufactured and processed methamphetamine and having sold and delivered the drug. His defense was entrapment. Before the Supreme Court, the defendant also argued the level of the government agent's involvement in the manufacture of methamphetamine was so high that the prosecution of the drug's manufacture was a violation of due process. The Supreme Court disagreed, and stated:

> "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the govern-

ment from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165[, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396] (1952), the instant case is distinctly not of that breed." *Russell*, 411 U.S. at 431-32, 36 L. Ed. 2d at 373, 93 S. Ct. at 1643.

While Illinois case law has not reversed or barred a conviction based upon this theory, other jurisdictions have. Defendant cites *People v. Isaacson* (1978), 44 N.Y.2d 511, 378 N.E.2d 78, 406 N.Y.S.2d 714, in support of his argument. In *Isaacson*, the Court of Appeals of New York held police misconduct warranted dismissal of the defendant's indictment for the sale of cocaine. The police misconduct in *Isaacson* was the direction from the police to the informant that the transaction must take place in New York even though the defendant feared New York's drug laws and did not want to enter the State, and to purchase two ounces of cocaine in order to obtain a conviction for a more serious crime. To cause the defendant to sell drugs in New York, the informant kept changing the destination of the sale progressively northward toward the Pennsylvania-New York border, at a spot where it would be difficult for the defendant to ascertain his exact location. On appeal, the court of appeals stated even though the defendant failed to make out an affirmative defense of entrapment because of his predisposition to commit the crime, the police conduct when tested by due process standards was so egregious and deprivative as to bar the prosecution.

Authority from other jurisdictions is not binding upon Illinois courts. (*People v. Chandler* (1980), 88 Ill. App. 3d 644, 411 N.E.2d 283.) Further, this authority is not applicable here, because the police conduct in this case is not egregious. Defendant contends it is outrageous for police to select a specific amount of cocaine for a controlled sale and thereby determine the degree of felony and the mandatory minimum penalty. Defendant is also offended the cocaine was offered at a "bargain-basement" price, thereby enticing defendant to accept an offer too good to refuse. We do not share defendant's sense of outrage.

Here, defendant was not even the initial target of the police investigation. According to the record, the police kept "tripping over the defendant" in their investigation of Juan Brown. The only testimony in the record regarding the determination of the amount and price of the cocaine sold to defendant was by Officer Davis. His testimony was the five ounces was the amount of cocaine the Task Force had available to it in the type of packaging which would generally be considered a higher-quality cocaine. Davis also testified the price of

$3,000 for the five-ounce amount of cocaine would be at the lower end of the market price, but a larger quantity sale would often result in some sort of discounted or cheaper price per ounce. Davis also testified the final determination regarding the price of $3,000 was made by Lieutenant Wolfe. No questions were asked of Wolfe regarding this topic.

Based upon the evidence, neither the amount nor the price at which the cocaine was sold violated any due process rights. The judgment of the trial court is affirmed.

Affirmed.

LUND, P.J., and McCULLOUGH, J., concur.