OPINION OF THE COURT
Cooke, J.
We reverse and dismiss the indictment against defendant; we so hold for the fundamental reason that due process compels it.
This case concerns fortunately rare, and inexplicable, police misconduct. Involved is reprehensible police action,* including violence and deception, culminating in the further deceitful luring of a Pennsylvania resident into New York solely to make a sale of cocaine, for which he was convicted and sentenced to 15 years to life at Attica. At the time of trial, defendant was in his mid-twenties and was a graduate student and teacher at Penn State University, on the brink of receiving his doctoral degree in plant physiology and biochemistry. He resided at State College, Pennsylvania. Although he admitted to having used three controlled substances on very few occasions, he had no prior criminal record.
The events leading to defendant’s conviction trace back to December 5, 1974 when J. D. Breniman, a young man with an unsavory drug history, was arrested by the New York State Police in Steuben County for possession of a controlled substance in the second degree, a class A-2 felony punishable by a 15-year to life term. At the time of his apprehension, Breniman was on bail pending an appeal from a 1973 conviction, based on a guilty plea for possession of a dangerous drug in the fourth degree, for which he had been sentenced to an indeterminate term of zero to three years at the New York Correctional Facility at Attica.
*515 Breniman, who at defendant’s trial admitted to being an inveterate user of drugs, including amphetamines, sedatives, hallucinogens, marihuana and heroin, and a seller for profit to maintain his habit, was interviewed after his arrest on December 5, 1974 at the New York State Police substation at Painted Post. As found as a matter of fact by the trial court, during this questioning, an investigator of the New York State Police struck Breniman with such force as to knock him out of a chair, then kicked him, resulting in a cutting of his mouth and forehead, and shortly thereafter threatened to shoot him. Breniman testified that this abuse was administered because he refused to answer a question, that when struck his glasses flew off, that he was kicked in the ribs when down, that a chair was thrown at him, that he was also threatened with being hurled down a flight of steps, and that one of two uniformed State troopers who witnessed these events said, 'T [Breniman] may as well forget about it. They would swear that I fell coming in the substation on the steps.”
Following his seizure on December 5, 1974, Breniman was held without bail at the Steuben County Jail until December 24, when he was released. By December 23, one of the officers involved in his case had received a lab report showing that the capsules found on Breniman, which were the basis for his class A-2 felony charge and which had been purchased from defendant, were not controlled substances at all. Rather than being amphetamines of a type referred to on the street as "Black Beauties”, they were in fact nothing more pernicious than caffeine. However, Breniman was not told of this until some time later, at the trial of this matter — after he had been used by the police as an informant in this case.
Upon the advice of his attorney, and while suffering under the contrived delusion that he was still facing a long prison incarceration if found guilty of the A-2 felony on top of his previous conviction, Breniman agreed to assist the State Police as an informant. Although not specifically promised that his aid to the police would result in a lesser sentence, his attorney advised that this would provide him with a bargaining position with respect to the charges against him. The violence and threats of the investigator were not the reason for his co-operation, so he stated. Nevertheless, the trial court found that Breniman testified he would not have aided the police were it not for the fact that they deceived him by not *516 revealing that the charges relating to the December 5 arrest would not stand up in court.
Breniman began his informant activities by telephoning various persons indiscriminately for the purpose of setting up drug sales in which the police would arrest the sellers. He made "collect” calls and one of the individuals contacted was defendant, whom he had known for two years through a mutual friend at State College. Defendant’s version of the conversations is that Breniman cried and sobbed on the phone, relating that he was facing 15 years to life in Attica, that his parents had effectively cast him from the family home, that he was running out of friends, and that he was looking for ways to make money to hire a decent lawyer. Breniman’s recollection was that he had not made the remarks in the manner described by defendant, but he otherwise corroborated defendant’s version. He admitted telling defendant that he was in trouble, that the police had beaten him, that he feared going to Attica, and that he needed a "score” or "deal” so that he could hire an attorney and "make” bail.
Between December 24, 1974 and January 4, 1975, Breniman made seven phone calls to defendant before finally arranging a sale. Initially, he sought to buy heroin, but defendant flatly refused. As to cocaine, defendant tried to put him off by saying that there was nothing worthwhile, but Breniman persisted in his efforts to get defendant to make a sale.
At the time of Breniman’s calls, defendant was living in an apartment in State College with Denise Marcon, a legal secretary, who admitted that she was a daily user of drugs including marihuana, cocaine, LSD, amphetamines and depressants. She testified that in October and November of 1974 defendant had sold one-gram quantities of cocaine which he kept at the apartment, and this was confirmed by Breniman who alleged that he made two purchases of small amounts of cocaine from defendant during these months. Although Mar-con had not herself spoken to Breniman about a sale, defendant discussed with her at length Breniman’s request.
Defendant’s studies and his teaching responsibilities required him to work 12 to 14 hours a day. He did not have access to someone who could supply him with the cocaine — the two ounces worth $3,800 which Breniman was seeking — but Denise Marcon did. She called a girl friend who gave her a number at which to contact a man known as "Zorch”. Al *517 though Marcon testified that defendant indicated that a sale of this magnitude to Breniman was worth $1,000 to them, she also confirmed that a desire to help Breniman was defendant’s motivation for entering into the transaction.
The sale was scheduled for January 4, 1975. The State Police claimed no knowledge of Breniman’s prior negotiations, but had spoken to Breniman concerning the sale in general. The investigator, who had previously struck Breniman, detailed the specifications to his victim-turned-informant. Breniman said he might be able to get an ounce of cocaine, but the investigator told him to get two because it was his experience that one never gets exactly what is asked for and he wanted a sale of at least one ounce to obtain a conviction for a higher grade of crime. Defendant feared New York’s drug laws and did not want to enter the State, but the investigator instructed Breniman that the transaction must take place in New York where he had authority to make an arrest.
To cause defendant to sell drugs in this State, Breniman cleverly kept changing the destination, progressively northward, culminating in an arrangement by which defendant would make a three- or four-hour trip to meet at a place near the Pennsylvania-New York border, at a spot where it would be difficult for defendant to ascertain his location. Initially, defendant agreed to meet in Williamsport, Pennsylvania, one and a half hours distant from State College. Breniman then succeeded in inducing defendant to commit himself to journey to Mansfield, a point near Williamsport and also in the Quaker State. Finally, he acceded to drive another 15 miles north from Mansfield to Lawrenceville, Pennsylvania, which is just south of the State boundary.
The meeting place finally settled upon was the Whiffle Tree Bar, which Breniman told defendant was in Lawrenceville. What Breniman did know, and defendant did not, was that the bar was actually in the Town of Lindley, Steuben County, New York. Traveling north on Route 15 in Pennsylvania toward Lawrenceville, the only clear indication a motorist might have that he is leaving Pennsylvania is a sign adjacent to the southerly approach of a bridge spanning the Cowanesque River and welcoming the traveler to New York State. Actually, the State line is several hundred yards southerly of the bridge and is designated by a stone marker, which at the time of defendant’s visit had crumbled and was obscured in the vegetation alongside the road. The Whiffle Tree Bar is *518 situate between the hidden stone marker and the bridge sign and thus is located in the Town of Lindley in New York State, rather than in Lawrenceville, Pennsylvania, as defendant had been led to believe. Although Breniman devised the scheme for bringing defendant into this State, it was the State Police investigator who independently determined that the proposed location was within his jurisdiction.
Defendant engaged in a rather elaborate method of delivering the cocaine, including an arrangement to have Denise Marcon drive along in a separate vehicle conveying the contraband and the toting beneath his shirt of a plastic bag containing a nonnarcotic substance with a cocaine appearance to be turned over in the event of a "rip-off”. He testified these precautions were suggested by Zorch, the supplier. The Appellate Division majority and trial court inferred that defendant’s use of these methods showed he was not unskilled but was knowledgeable and wary. This evaluation is belied by the ease with which he was enticed into New York.
Defendant’s precautions notwithstanding, he was arrested in the course of the transaction outside of the Whiffle Tree Bar. Breniman was called as a material witness. So was defendant’s former paramour, Denise Marcon, who testified for the prosecution in return for a promise of life-time probation for her part in the sale.
Following a trial, without a jury, at which defendant raised the defense of entrapment and urged that his due process rights were violated, the County Judge found him guilty of criminal sale of a controlled substance in the first degree in violation of section 220.43 of the Penal Law, and imposed sentence. The Appellate Division affirmed, but two Justices vigorously dissented. For reasons which follow, we reverse and dismiss the indictment.
In holding that this prosecution should be barred, we find it unnecessary to examine in detail the question of whether this defendant was predisposed to commit the crime (see Penal Law, § 40.05). County Court found as a matter of law and fact that defendant did not prove by a preponderance of the evidence the defense of entrapment and the Appellate Division majority in turn held that the record amply supports the determination that defendant was predisposed to commit the offense for which he was charged. Even though defendant did not sustain his burden as to this affirmative defense (see Penal Law, § 25.00, subd 2), the police conduct, when tested by due *519 process standards, was so egregious and deprivative as to impose upon us an obligation to dismiss.
Recent cases show greater recognition of due process as a check on police misconduct. In United States v Russell (411 US 423), based on a finding that defendant was predisposed to commit the crime, the Supreme Court rejected an entrapment defense even though a government agent supplied him with a chemical ingredient used by him to manufacture drugs illegally. However, while adhering to the test enunciated in Sorrells v United States (287 US 435), the court envisioned: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165” (411 US, at pp 431-432). In a later case, however, the meaning of Russell divided the majority of the court, which upheld a conviction where the government supplied contraband to a defendant later prosecuted for trafficking in the same (Hampton v United States, 425 US 484). Referring to Russell, the plurality stated: "We ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established” (id., at pp 488-489). Two Justices concurred, on the basis that they were "unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition” (Powell, J., with whom Blackmun, J., joined, concurring in judgment, 425 US, at p 495). Therefore, in light of the concurrence and the dissent of three Justices in Hampton (see 425 US, at pp 495-500), a dismissal on due process grounds in the context of an insufficient entrapment defense has not been ruled out by the Supreme Court.
Of course, under our own State due process clause (NY State Const, art I, § 6), this court may impose higher standards than those held to be necessary by the Supreme Court under the corresponding Federal constitutional provision (see Oregon v Hass, 420 US 714, 719; see, generally, Brennan, State Constitutions and the Protections of Individual Rights, 90 Harv L Rev 489). However, the views expressed by some members of the Supreme Court, as well as those of other *520 courts and respected commentators, illustrate and articulate the need for a due process analysis of the boundaries of permissible police conduct. We therefore decide this case under our own State Constitution.
It has been said that " 'due process,’ unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances” (Anti-Fascist Committee v McGrath, 341 US 123, 162 [Frankfurter, J., concurring]). It embraces fundamental rights and immutable principles of justice (People v Terra, 303 NY 332, 334) and use of the term is but another way of saying that every person’s right to life, liberty and property is to be accorded the shield of inherent and fundamental principles of justice (see Ives v South Buffalo Ry. Co., 201 NY 271, 293, 295-296; see, also, People v Yamin, 45 Misc 2d 407, 417). Due process of law guarantees respect for personal immunities "so rooted in the traditions and conscience of our people as to be ranked as fundamental” (Snyder v Massachusetts, 291 US 97, 105 [Carduzo, J.]). It imposes upon courts the duty to foster " 'that fundamental fairness essential to the very concept of justice’ ” (People v Leyra, 302 NY 353, 364). Although an application of due process to outrageous conduct of law enforcement agents such as to warrant a restraint of the government from invoking judicial procedures in obtaining a conviction has evolved more recently, the doctrine is an ancient one traceable to Magna Charta and has been "so often judicially defined that there can be no misunderstanding as to [its] meaning” (see Ives v South Buffalo Ry. Co., 201 NY 271, 292-293, supra).
Where the police obtain evidence by brutalizing a defendant, a conviction resulting from such methods offends due process (see, e.g., Rochin v California, 342 US 165, supra). And, as noted, even where a defense of entrapment is not made out because of the predisposition of the defendant to commit the crime, police misconduct may warrant dismissal on due process grounds (see United States v Russell, 411 US 423, 431-432, supra; see, also, Hampton v United States, 425 US 484, 495, supra [Powell, J., concurring]; cf. 425 US, at pp 495-500 [Brennan, J., dissenting]). Moreover, the type of conduct which mandates the barring of prosecution ought not to be limited to situations involving police brutality (see 87 Harv L Rev 243, 252; see, also, Cox v Louisiana, 379 US 559; Raley v Ohio, 360 US 423, 439; cf. United States v Archer, 486 F2d 670). To prevent improper and unwarranted police solici *521 tation of crime, there is a need for courts to recognize and to uphold principles of due process (see United States v Lue, 498 F2d 531; see, also, Comment, Viability of the Entrapment Defense in the Constitutional Context, 59 Iowa L Rev 655; Comment, Defense of Entrapment: Next Move— Due Process?, 1971 Utah L Rev 266; cf. People v Joyce, 47 AD2d 562, 564). This is a case that demands the application of these principles.
While due process is a flexible doctrine, certain types of police action manifest a disregard for cherished principles of law and order. Upon an inquiry to determine whether due process principles have been transgressed in a particular factual frame there is no precise line of demarcation or calibrated measuring rod with a mathematical solution. Each instance in which a deprivation is asserted requires its own testing in the light of fundamental and necessarily general but pliant postulates. All components of the complained of conduct must be scrutinized but certain aspects of the action are likely to be indicative (see People v Taranovich, 37 NY2d 442, 445; cf. Sortino v Fisher, 20 AD2d 25, 28).
Illustrative of factors to be considered are: (1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity (compare Greene v United States, 454 F2d 783, with United States v Russell, 411 US 423, supra); (2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice (see United States v Archer, 486 F2d 670, supra; cf. Rochin v California, 342 US 165, supra); (3) whether the defendant’s reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness (see Schecter, Police Procedure and the Accusatorial Principle, 3 Crim L Bull 521, 527); and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace. No one of these submitted factors is in itself determinative but each should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives — the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness. As a bare minimum, there should be a purposeful eschewal of illegality or egregious foul *522 play. A prosecution conceived in or nurtured by such conduct, as exemplified in these guidelines, so as to cast aside and mock "that fundamental fairness essential to the very concept of justice” should be forbidden under traditional due process principles.
Applying these factors to this case, first we find the manufacture and creation of crime. At most, and over his denial, the record shows that defendant had made small and rather casual sales of drugs. Indeed, it was established that he did not himself have access to the quantity of drugs sought by Breniman and for which he was arrested but was only directed to the source by one who testified against him. Doubtless, a crime of this magnitude would not have occurred without active and insistent encouragement and instigation by the police and their agent.
Turning to the second component, serious police misconduct repugnant to a sense of justice is revealed. Initially, there was conceded abuse of Breniman at the substation. While this harm was visited upon a third party, it cannot be overlooked, for to do so would be to accept police brutality as long as it was not pointed directly at defendant himself. Not only does the end not justify the means, but one should not be permitted to accomplish by indirection that which is prohibited by direction. More importantly, these actions set the pattern for further disregard of Breniman’s rights in failing to reveal to him that the material he possessed on December 5 would not subject him to criminal charges (cf. Brady v Maryland, 373 US 83). This was deceptive, dishonest and improper; it displayed a lawless attitude and, if countenanced, would suggest that the police are not bound by traditional notions of justice and fair play.
The third factor embraces a persistent effort to overcome defendant’s reluctance to commit the crime. Breniman, as informant, played upon defendant’s sympathy, their past relationship, and persevered in his requests despite defendant’s obvious unwillingness. Moreover, even if defendant was motivated by expectation of profit, the lure of exorbitant gain is not a proper basis to create crime for the purpose of obtaining convictions. With resistance so undermined, even a person not predisposed to crime may be enticed to violate the law.
Finally, there is the overriding police desire for a conviction of any individual. In this respect, one is immediately shocked by an incredible geographical shell game — a deceit which *523 effected defendant’s unknowing and unintended passage across the border into this State. While this outright fraud was ostensibly accomplished by an informant, he was acting at the behest of the police, who emphasized that the sale must take place in New York, and thus are chargeable with the tactics employed by their agent (see Johnson v United States, 317 F2d 127, 128; State v Stein, 70 NJ 369). Of course, in a particular case it may be necessary for the police to apprehend a criminal who operates outside our borders, but this is not such a situation. There is no suggestion that defendant had previously sold great quantities of cocaine. In short, the police wanted a conviction and simply set two specifications— a large amount of the substance to denote a high grade of crime and a situs of sale in New York. There was no indication of any desire to prevent crime by cutting off the source and, thus, the conviction obtained became little more than a statistic.
In sum, this case exposes the ugliness of police brutality, upon which was imposed a cunning subterfuge employed to enlist the services of an informant who, deceived into thinking he was facing a stiff prison sentence, desperately sought out any individual he could to satisfy the police thirst for a conviction, even of a resident of another State possessed of no intention to enter our confines. Separately considered, the items of conduct may not rise to a level justifying dismissal but viewed in totality they reveal a brazen and continuing pattern in disregard of fundamental rights.
As expected, the argument is advanced that the police are to be condemned, but the criminal should still be punished. Indeed, defendant’s conviction was allowed despite the castigation of police conduct as "improper” and "reprehensible”. Whether conduct is so outrageous is a question of degree to be answered by sound judgment, but "there comes a time when enough is more than enough — it is just too much” (Williamson v United States, 311 F2d 441, 445 [Brown, J., concurring]). In this case, the police have simply gone too far. This court would be paying mere lip service to the principle of due process if it sanctioned the continuance of a prosecution in the face of the revelations of this record.
Certain comments in the dissent warrant discussion. Although stated elsewhere in this opinion, it appears to be necessary to emphasize our recognition that defendant has not established the defense of entrapment. That defense is not the *524 issue in this case and no attempt has been made to interfere with or disturb the fact-finding powers of other courts. Analysis is not advanced by disputes over the extent of defendant’s predisposition. To be sure, he was predisposed to commit the crime, and for that reason the defense of entrapment failed. However, the proper focus is on whether, regardless of defendant’s inclinations or criminal intent, due process mandates dismissal of his indictment.
Presented for our legal evaluation are undisputed facts and findings of the trial court that the police engaged in serious misconduct, which even the dissent characterizes as "devious” and "inexcusable” (dissent, at p 527). The dissent would overlook this conduct because the defendant was not "a direct victim of police malfeasance” (at p 527). The point is, however, that while the informant was the victim of the trickery and beating, these actions were indeed directed at defendant. This misbehavior set the pattern for an investigation in which the informant was maliciously used as a pawn to obtain a conviction of any individual. The dissent apparently finds nothing wrong with this technique. Tactics here employed, if not checked, are certain to encourage lawlessness and destroy cherished freedoms. A defendant charged with the most heinous of crimes is still entitled to the fundamental fairness we conceive under the notion of due process.
The undisputed facts and the express findings of the trial court provide the pivot on which this case turns and the basis from which this opinion is reasoned. A standard must be set somewhere and the line should be drawn here.
To be sure, "[cjriminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer” (Sherman v United States, 356 US 369, 372). However, while Justice Frankfurter’s view was not adopted in the analysis of the entrapment defense, we now apply it in a due process context, thereby affirming this fundamental principle: "No matter what the defendant’s past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society” (id., 356 US, at pp 369, 382-383, Frankfurter, J., concurring]). There may be those who fear that dismissal of convictions on due process grounds may portend an unmanageable subjectivity. Such apprehension is unjustified for courts by their very nature are constantly called upon to *525 make judgments and, though differences of opinion often surround human institutions, this is the nature of the judicial process (see Rochin v California, 342 US 165, 170-171, supra). Circumscribed by a sizeable body of constitutional and common law pronounced and steeped in traditions of Anglo-Saxon jurisprudence, due process is our most fundamental principle of law and must be applied here. The administration of justice must be above reproach (People v Savvides, 1 NY2d 554, 556). We therefore hold that this prosecution should be barred.
Accordingly, the order of the Appellate Division should be reversed, and the indictment dismissed.

 The majority and the dissenters at the Appellate Division both characterized the police conduct as "reprehensible” (56 AD2d, at pp 226, 231).