LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a judgment of conviction and sentence for the offense of unlawful possession of cocaine, a controlled substance enumerated in Title 20, Section 2-25, Schedule II of the Code of Alabama, known as the Alabama Uniform Controlled Substances Act. Defendant was fined $25,000 and sentenced to imprisonment for fifteen years.
Two issues are presented by appellant, which we now consider in the order found in brief of counsel for appellant.
I.
By this issue, the contention is made that “the trial court erred in refusing to instruct the jury on the defense of entrapment.” The case of Jackson v. State, 384 So.2d 134 (Ala.Crim.App.1979), writ quashed, 384 So.2d 140 (Ala.1980), is relied upon by appellant as to this issue. We quote from the opinion in the cited case at page 139 as follows:
“The distinction between an inducement that entraps and an inducement that merely detects has been variously stated in multitudinous instances. We accept the following as satisfactory and attractively succinct:
“ ‘One who is instigated, induced, or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise had no intention of committing may avail himself of the defense of entrapment. Such defense is not available, however, where the officer or other person acted in good faith for the purpose of discovering or detecting a crime and merely furnished the opportunity for the commission thereof by one who had the requisite criminal intent.’ 22 C.J.S. Criminal Law, § 45(2).
“A valuable discussion of applications of the distinction is furnished by Judge Bowen in Tyson v. State, Ala.Cr.App., 361 So.2d 1182, in which it is stated at 1186,
“ ‘The primary focus is on a predisposition of the accused rather than on the agent’s actions.’ ”
We note also that it was stated at page 140 in Jackson v. State as follows:
“Although it is conceivable, if all the facts bearing on the question were shown in evidence, that it could be said as a matter of law whether there was an entrapment, this cannot be said on a consideration of the evidence on a trial of the case. Not being determinable either way as a matter of law, it became a question for the jury to decide under proper instructions by the court. In view of the action of the court in ruling that there was no issue for the jury to decide on the question of entrapment, declining to allow attorneys for defendant to argue to the jury the matter of the question of entrapment, and refusing the charge requested by defendant on the subject on the sole ground that no jury question as to entrapment was presented and that on the ground that the defense of entrapment was not available to defendant, we must find that such action constituted error prejudicial to defendant and that the judgment of the trial court should be reversed and the cause remanded.”
II.
By the only other issue in the case, the question is raised as to “Whether the trial court erred in failing to suppress evidence that was obtained in a warrantless search.” In support of this issue, counsel for appellant cites the case of Murray v. State, 396 So.2d 125 (Ala.Cr.App.1980), cert. denied, 396 So.2d 132 (Ala.1981), which, in our opinion, does not support appellant’s contention as to the issue under consideration.
We are of the opinion that a recital of the material facts in this case is sufficient to lead to the conclusion that this issue should be determined adversely to appellant. We *672 proceed to give a summary of such material facts.
The first witness for the State was Officer Steve Anderson, who had been engaged in law enforcement approximately seven years, three of which had included investigation for narcotics, who said that he went with other officers with a search warrant for cocaine to Debbie Holland’s apartment, from where they had received notice to be there.
Debbie Holland testified as a witness for the State that on the night in question at approximately 9:00 or 9:30 in the morning, she was visited by police officers. We now quote from her testimony:
“Q. Then what happened?
“A. They proceeded to search my apartment.
“Q. Did they find anything?
“A. Yes', sir.
Q. What did they find?
“A. They found approximately half a pound to three-quarters of a pound of marijuana.
Q. Where did they find that?
“A. It was sitting in a leather bag in the middle of the floor.
[[Image here]]
“Q. Did they find any other drug-related items?
“A. Yes, sir.
“Q. What else did they find?
“A. They found a pair of scales, the grinder that had been used.
“Q. A grinder?
“A. A grinder that had been used for grinding cocaine.
“Q. Okay.
“A. A plate that had shavings or dust-ings or cocaine, and I believe they found some bag comers of plastic bags that had been cut away.
“Q. Did those items belong to you?
“A. They were in my apartment with my knowledge. They did not belong to me, but they were there with my knowledge.
“Q. Okay. Did they find something in the microwave?
“A. Yes, sir.
“Q. Why was something in the microwave? I’m just curious.
“A. That was a suggestion that it be put there, which I told them where it was. I told them.
“Q. You told the police officers?
“A. Yes, sir.
“Q. Somebody else suggested putting it there?
“A. There had been some discussion which this has nothing to do with this case, but Mr. Elam said he thought that it might be a good idea to put it in an obvious place, not an inobvious place. I told them where it was.
[[Image here]]
“Q. Did you cooperate with the police officers when they showed up?
“A. Yes, sir.
“Q. Did you tell them about the marijuana?
“A. Yes, sir. I mean, it was obvious it was there.
[[Image here]]
“Q. Did you tell them how the residue came to be located in your apartment?
“A. Yes, sir.
“Q. Did you tell the police officers anything about Mr. Albert Neal Aycock?
“A. Yes, sir.
“Q. What did you tell them?
“A. That he had been in my apartment the day before and had brought approximately — I can’t say how much, because there was no discussion of exactly how much there was. I know it was — it seemed like a lot to me, but, you know, he came over and brought it to me and left it and, and, you know, I became a little bit apprehensive and scared.
“Q. When he brought the cocaine to you the day before—
“A. That was on Sunday.
“Q. On Sunday?
*673 “A. Yes, sir.
“Q. And this search was on what day of' the week?
“A. Monday.
“Q. So it was the day before the search that he brought it to you?
“A. Yes, sir.
“Q. On that Sunday when he brought it to you, did he tell you anything what to do with the cocaine or how to dispose of it?
“A. No, sir, he didn’t. There was no discussion of anything.
“Q. All right. Did you discuss with the police officers the circumstances surrounding him bringing that cocaine to you?
“A. Yes, sir.
“Q. Did you tell the police officers what you had done with it?
“A. Yes, sir.
“Q. What did you tell them?
“A. I told them that I had received a phone call from Mr. Aycock — Neal Ay-cock — and he had told me that he was coming over and he would be there in 30 to 35 minutes. There was no discussion of, you know, why or wherefore’s. He came over, and he had it with him. He gave it to me; there was no exchange of money. There was no discussion of money, nothing.
“Q. How long did he stay at your apartment on that Sunday?
“A. Approximately ten minutes, if not less.
“Q. Did you have Mr. Aycock’s pager number?
“A. Yes, sir.
“Q. How had you gotten that?
“A. I had gotten it from a personal friend of mine.
“Q. You had not gotten it directly from Mr. Aycock?
“A. No, sir.
“Q. Had you gotten it with Mr. Ay-cock’s knowledge and permission, or do you know?
“A. I have no idea.
“Q. On the Monday when the police officers were searching your apartment, did they request your assistance in investigating Mr. Aycock?
“A. Yes, sir.
“Q. What did they ask you to do?
“A. They explained to me what my options were, or, you know, what I needed to do was to try to call him and get him to call me back.
“Q. Did you refuse to do that?
“A. I was hesitant at first, but then I did it.
“Q. So in the end, you did cooperate?
“A. Yes, ■ sir.
“Q. Did you place the phone call?
“A. Yes I did.
“Q. Now, the pager is what, a tone that goes off and whoever has the pager calls back?
“A. Yes, sir.
“Q. Did you get a response from making that first phone call?
“A. No, sir.
“Q. How long did you wait for a response?
“A. About 20 to 30 minutes.
“Q. Did you make another phone call?
“A. Yes, sir.
“Q. To the same phone number?
“A. Yes, sir.
“Q. Did you get a response to that one?
“A. I believe it was just a very few minutes later, maybe eight to ten minutes.
“Q. You did get a response?
“A. Yes, I did.
“Q. What response did you get?
“A. I answered the phone, and it was Mr. Aycock.
“Q. Did you recognize his voice, or did he identify himself?
“A. No, I knew his voice because, you know — I mean, he didn’t say anything about his name. He said, ‘How is everything today?’ and I said, ‘Well, fine.’ And I said, ‘Could you come over?’ and he said, *674 ‘Yes.’ And I said, ‘Could you bring anything with you?’ And he said, ‘Yes, is 30 minutes okay?’ and I said, ‘That will be. fine,’ and that was the end of the conversation.
“Q. When you said, ‘Can you bring anything with you,’ did that have a specific meaning to you?
“A. Well, I have never had any dealings with the law, and I didn’t know what to say, if I should say ‘cocaine’ or anything related directly to drugs.
“Q. Did you understand that to mean you can bring cocaine?
“A. Well, I mean, that’s what the police officers had wanted. They had instructed me that that was the purpose of the call.
“Q. Okay. And you attempted to get Mr. Aycock to bring some cocaine to the apartment; is that right?
“A. Yes, sir.
“Q. That’s the whole point of the phone call?
“A. Yes, sir.
“Q. Did you think you had done that? Is your understanding that your phone conversation with Mr. Aycock resulted in that you had done that?
“A. At that point, yes.
“Q. So you believed in your own mind that Mr. Aycock was coming within 30 minutes and would have some cocaine with him; is that right?
“A. Yes, sir.
“Q. Did you tell the police that?
“A. Yes, sir.
“Q. After the phone conversation, you said—
“A. They were there. They heard it.
“Q. They heard your end of the conversation?
“A. Yes, sir.
“Q. Did you tell the police officers that he was coming over within the next 30 minutes and your understanding was he was going to bring cocaine?
“A. I said he was coming, and that I had no guaranteé whether he would bring anything or not, but, you know, that that was the understanding.
“Q. That was the understanding?
“A. Yes, sir.
“Q. Okay. Did he in fact come?
“A. Yes, sir.
“Q. How long did it take him to get there?
“A. About an hour.
“Q. Were the police officers still there?
“A. Yes, sir.
“Q. Were you still cooperating with them?
“A. Yes, sir.
“Q. Did you answer the door when Mr. Aycock arrived?
“A. Yes, sir.
“Q. What happened?
“A. I opened the door, and they brought him inside and started reading him his rights, and they wanted to search him and took him into the kitchen and asked him to take his clothes off, and they took me into another room.
“Q. Did you actually see them take anything out of his pockets?
“A. I had left the room.
“Q. So you don’t know whether they found anything from your own personal knowledge or not?
“A. No, sir.”
We now quote from the testimony of Debbie Holland on cross-examination:
“Q. Miss Holland, was the idea of calling Neal Aycock that day from your apartment the idea of the police officers? Are they the ones that made that suggestion for you to call Neal Aycock?
“A. Well, yes.
“Q. All right. And go on. You were getting ready to say something else.
“Q. I didn’t know. I was scared at the time.
“Q. You knew you were in trouble at that time, didn’t you?
“A. Yes, sir.
*675 “Q. And the officers — you were under arrest at that time, weren’t you?
“A. They told me they were going to take me downtown and arrest me.
“Q. You knew you were under arrest at that time, and you stated earlier you hadn’t been in any kind of trouble before, so you were scared, right?
“A. That’s correct.
“Q. And you felt like you were in big trouble that morning, the morning that you called Neal Aycock, didn’t you?
“A. Yes, sir.
“Q. And it was the officers who brought up Neal Aycock’s name, isn’t it?
“A. I honestly can’t remember.
[[Image here]]
“Q. Okay. Therefore, it was the officers who first mentioned his name to you?
“A. I told them where I had got the cocaine from the day before. That’s how his name came up.
“Q. Well, let’s talk about that conversation. Was it your testimony that Neal Ay-cock came to your apartment the day before his arrest and left some cocaine there?
“A. Yes, sir.
“Q. And that there was no discussion at all between you and him about what you were to do with it, about why he was leaving it there, about any of the circumstances surrounding why the cocaine had been brought to your apartment and left there?
“A. That’s correct.
“Q. Is that your testimony?
“A. Yes.
“Q. He just showed up out of the blue, after calling you 30 or 40 minutes before?
“A. Yes, sir.
“Q. And gave this to you?
“A. Yes, sir.
“Q. And he didn’t tell you what you were supposed to do with it?
“A. No, sir.
“Q. Did you tell the officers that?
“A. Yes, sir.
“Q. Where did you put that cocaine?
“A. Gary Elam had taken it with him that evening, because I didn’t want it in my apartment.
“Q. Was Mr. Elam taking it with him to sell?
“A. He told me he knew where he could get rid of it.
“Q. And you understood that meant he was going to try to sell it?
“A. No, sir, because I didn’t care where it went. All I wanted was it out of my apartment.
“Q. You know or you heard that Gary Elam has been charged with selling some kind of drugs as a result of this search of your apartment on February 3rd, don’t you?
“A. Yes, sir.
[[Image here]]
“Q. In any event, that morning, on February 3rd, did the police officers tell you that they were going to charge you with possession of cocaine or possession of cocaine for sale if you didn’t cooperate with them?
“A. No, not in those words.
“Q. What words did they use?
“A. Well, I just knew I was in trouble.
“Q. Okay. What words did they use that led you to believe that you were in trouble
“A. I wanted to cooperate with them, and that’s the reason I made the phone calls.
“Q. Well, they told you they were going to send you off to prison if you didn’t, didn’t they?
“A. Well, they wanted — they asked me if I knew what happened to people in prison.
“Q. Pardon?
“A. They asked me if I knew what happened to women that were sent to prison.
“Q. Did you know? Well, what did you think happens to women when they are sent to prison, or did they tell you?
*676 “A. I have no idea. They didn’t go into any details.
“Q. Did you understand that they were referring to the fact that you might be physically endangered if you were sent off to prison?
“A. Yes, sir.
“Q. And that scared you, didn’t it?
“A. Yes, sir.
“Q. Did they tell you how long you would be sent off to prison for?
“A. Yes, sir.
“Q. How long did they say you were going to be sent off to prison?
“A. Twenty years.
“Q. Okay. Did they tell you that you were going to be charged with some kind of felony or serious crime?
“A. Yes, sir.
“Q. And that would lead to the 20 years sentence?
“A. Yes, sir.
“Q. What else did they tell you that scared you?
“A. That’s all I can remember.
“Q. Okay. And then was it after they told you these things that the suggestion was made or the idea came to call Neal Aycock?
“A. Yes, sir.
“Q. And in doing that and in furnishing Mr. Aycock’s name to the officers, you were trying to help yourself, weren’t you?
“A. Yes, sir.
“Q. You were trying to avoid a 20-year sentence and any kind of potential for danger to your physical self, weren’t you?
“A. Yes, sir.
“Q. All right. And after you talked to Mr. Aycock and so forth, and you were still scared and you still knew that you might face a long prison term, didn’t you?
“A. Yes, sir.
“Q. And that was on your mind when you told the officers that your understanding of what was said between you and Neal Aycock concerned cocaine or drugs, right?
“A. Yes.
“Q. The word ‘cocaine’ or the word ‘drugs’ was never at any time mentioned between you and Neal Aycock, was it?
“A. No, sir.
“Q. And in fact, if the officers did not plant it in your mind that idea of calling him and calling to get him over there with cocaine, you would not have thought or you would not have understood that cocaine was what you say was the source of your conversation between you and Mr. Aycock, would you?
“A. It was my only outlet.
“Q. Your only out? It was the only way you could help yourself, wasn’t it?
“A. Yes.
“Q. Now, have you talked to any of these officers, Sergeant Anderson or any of the officers about testifying here today and testifying against Mr. Aycock?
“A. No, sir.
“Q. Well, do you recall — I guess it was in May — when Mr. Aycock’s case was set for trial, and you were brought here and put in jail?
“A. Yes, sir.
[[Image here]]
“Q. You talked with officers that time about testifying against Mr. Aycock, didn’t you?
“A. Not in any detail. They — I mean, I was just put in jail.
[[Image here]]
“Q. Did they promise you any reward to testify against Mr. Aycock that they had not promised you at the time of his arrest?
“A. No, sir.
“Q. Did they threaten you in any way if you didn’t testify against Mr. Aycock?
“A. No, sir.
“Q. What were you charged with as a result of the February 3rd search of your apartment?
“A. Possession of marijuana for personal use.
*677 “Q. And what happened to that charge?
“A. I got a $25 fine.
“Q. And that was done over in the City of Florence, the Municipal Court?
“A. That’s correct.
“Q. Did you actually go to court on that?
“A. Yes, I did.
“Q. And you paid a $25 fine?
“A. Yes, sir.
“Q. Now, you never at any time on the morning of February 3rd and before the phone calls to Neal Aycock, you never told any of the officers that you had gotten cocaine from Neal Aycock, did you?
“A. Not until after the questioning. I did tell them.
“Q. Not until after the questioning?
“A. Yes, sir.
“Q. You didn’t at any time, even after the questioning, did you, tell them that you had gotten cocaine from Neal Aycock?
“A. The day before, I told them.
“Q. Do you recall on April 1 of 1986, when you came to my office?
“A. Yes, sir.
“Q. And do you récall at that time giving me the taped statement, much as the one that you gave to Sergeant Anderson?
“A. Yes, sir.
“Q. Do you recall me asking you,— First of all, I told you that I was representing Mr. Aycock, didn’t I, with respect to these charges?
“A. Yes, sir.
“Q. And I asked if I had your permission to ask you some questions about it and get your responses to them, didn’t I?
“A. Yes, sir.
“Q. And you agreed to do that, didn’t you?
“A. Yes.
“Q. Now, do you recall me asking you this question: 'All right. And the conversation you had with the officers there in your apartment, before they got you to call Neal and they dialed the number for you, did you ever tell them that you bought or received drugs of any description from Neal Aycock?’
“Do you recall me asking you that question?
“A. Yes.
“Q. Do you recall your answer to that question?
“A. Yes.
“Q. What was your answer?
“A. No.
“Q. Do you recall me asking you this question: ‘Did you tell any of the officers that you had gotten that marijuana found in your apartment from Neal Aycock?’ Do you recall that question?
“A. Yes, sir.
“Q. What was your answer to that question?
“A. No.
“Q. Do you recall at the end of our conversation, Deborah, when I again asked you, ‘Okay, but you are positive that at no time did you tell the police that Neal was bringing drugs over there?
“A. That’s correct.
“Q. And me again asking you, ‘You are positive about that?’ Do you recall your answer?
“A. The day before and that day is the only day.
“Q. You told me on April 1, didn’t you, that you never told the officers you brought drugs over there?
“A. But I testified — I mean, I told them that he had brought the cocaine over there on Sunday, the day before, but never before that.
“Q. Do you recall the last question, ‘And you are also positive that at no time did you tell the officers that you had either bought or received or been supplied with drugs by Neal Aycock?’ Do you recall that?
“A. That’s correct.
“Q. And your answer in fact was, ‘That’s correct,’ right?
“A. Right.
*678 “Q. So I asked you one, two, three, four, five times on April 1 if you told any of the officers that Neal Aycock brought you drugs, and each time you answered that he had not; is that right?
“A. That’s correct.
“Q. Which is the truth, what you testified to on direct examination of Mr. Jones, what you told me on April 1?
“A. He had brought the drugs on Sunday. He had brought the cocaine on Sunday, the day before, but never before that day.
“Q. Well, you understood what my question pertained to. It pertained to at any time. Did you not understand that?
“A. But I told you that he had brought the cocaine over on Sunday, the day before.
“Q. You look through this, and you show me where you ever said that.
“A. There is something here that needs to be clarified, part of this conversation.
“Q. On there?
“A. On this, about the phone calls, I was coerced.
“Q. You were coerced?
“A. Yes.
“Q. Who coerced you?
“A. Mark Nix.
“Q. He coerced you coming into my office and giving that statement?
“A. Yes, he did.
“Q. Did he threaten you?
“A. No, sir.
“Q. Did he promise you any reward?
“A. No, sir.
“Q. How were you coerced?
“A. He just told me that it would be in everybody’s best benefit, meaning, I guess, himself, Mr. Aycock, and myself.
“Q. Did he coerce you like the officers coerced you to call Mr. Aycock? Would you call that coercion?
“A. Not in the same context. I mean—
“Q. Are you now retracting your answers to the questions that I have asked you about here today?
“A. Only about the phone calls.
“Q. Okay. What about the phone calls. Do you wish to retract?
“A. I made the phone calls of my own will.
“Q. You told me on April 1 that you made the phone calls.
“A. I dialed the phone.
“Q. Okay. What else did you tell me on April 1 that you now want to retract, other than the phone calls?
“A. I guess — I mean, I guess the fact that he was at my apartment on Sunday and he brought the cocaine over there, and I called him again on Monday.
“Q. Okay. You want to retract that portion? Anything else?
“A. This was after the discussion with the police officers.
“Q. Anything else you want to retract that you told me on April 1st?
“A. No, sir.
“Q. And you stated you told me that on April 1st under coercion from Mark Nix; is that correct?
“A. That’s correct.
“Q. And it’s the same type of coercion you felt like you were under on February 3rd after talking to the officers?
“A. Somewhat.
“Q. You felt threatened, didn’t you?
“A. Yes, sir.
“Q. And you felt like you ought to do what they asked you to do?
“A. I wanted to do what was right, yes.
“Q. And what was right for you is what you want to do too?
“A. Yes, sir.
“Q. And that’s what you were doing on February 3rd when you called Mr. Aycock wasn't it?
“A. Yes.
“Q. Now you have said in this statement — now, this statement is the one you made on February 3rd of ’86 to Sergeant *679 Anderson, you recall giving him a taped statement?
“A. Yes, sir.
“Q. That was after Mr. Aycock had been arrested?
“A. It was after, yes, sir.
“Q. And you stated in that statement, I believe, that you had only met Mr. Aycock two or three months before February 3rd?
“A. That’s correct.
“Q. And is that the truth?
“A. That’s right.
“Q. And that Mr. Aycock had only been to your apartment two times before February 3rd?
“A. That’s right.
“Q. Is that correct?
“A. That’s right.
“Q. And that February 3rd was the third time he had been to your apartment?
“A. That’s correct.
“Q. Is that the truth?
“A. Yes, sir.
“Q. Now, you have already told us— well, had you talked to him by telephone on any occasions other than what you have already testified about today?
“A. Before or after?
“Q. Before February 3rd when you talked to him on the phone?
“A. The first time he came by my apartment, he wanted to use the telephone. He called me and asked me if he could come and make some phone calls.
“Q. From your apartment?
“A. Yes, sir.
“Q. Is that the first time you had met him?
“A. No, sir.
“Q. I believe you said you met him at the Fogcutter; is that correct?
“A. That’s correct.
“Q. And did he go to your apartment that same night after you had met him at the Fogcutter?
“A. No.
“Q. Then he came to your apartment on one occasion, you said he brought some cocaine?
“A. He came and used the telephone, and then on the Sunday that he came, he brought the cocaine. And then the next time was when he came after I had called him.
“Q. That was on February 3rd?
“A. Yes, sir.
“Q. When he came to use the telephone at your apartment, how long was he there on that occasion?
“A. Maybe 20 minutes.
“Q. And did you and he get to know each other? Did you visit there on that occasion?
“A. Not at all. I watched television. He called his wife and made a few other calls. There was no conversation at all.
“Q. When he came there the Sunday before the arrest, I believe you stated that he was there approximately 30 minutes?
“A. Less than ten minutes.
“Q. Less than ten minutes? Did you have occasion to talk to him then and get to know him?
“A. Not really. He just said — Well, he said why don’t we have a party or have a big party or something.
“Q. All right. Now, how long did you talk to him over at the Fogcutter when you had just met him?
“A. Nothing but just a greeting.
“Q. Now, have you had occasion to personally talk to Mr. Aycock on any other occasion before February 3rd, other than what you have testified to already?
“A. No, sir.
"Q. Now, at the end of this statement, I’ll show it to you.
[[Image here]]
“Q. Sergeant Anderson asked you, ‘Okay, Debbie, let me ask you this question. Is there anything that I haven’t asked you that I need to ask you about?’ At that time, you answered, ‘Not as far as I know, but whatever you need to know, I *680 will answer the questions best I can. But, you know I have told you everything I know as far as Neal Aycock, my acquaintance with Tammy and Mr. Aycock. I don’t even know what he looks like.’ Do you see that?
“A. I was talking about Gary Elam there.
“Q. Okay. You weren’t talking about Mr. Aycock there?
“A. No, sir.
“Q. Everything that’s in this statement, is that essentially what you told the officers before the phone calls were made to Mr. Aycock?
“A. Yes, sir.
“Q. And you apparently didn’t know Mr. Aycock very well, did you, before February 3rd.
“A. No, sir.
“Q. In fact, you hardly knew him at all?
“A. He was a mere acquaintance.
“Q. But yet you told these police officers that your understanding was that he was referring to cocaine when you and he had your telephone conversation on February 3rd?
“A. That’s what they told me.
“Q. Who told you?
“A. The police officers wanted me to ask for that.
“Q. But Mr. Aycock never mentioned cocaine or drugs to you, did he, in that telephone conversation?
“A. No, sir.
“Q. Well, you testified that you barely knew him; is that correct?
“A. That’s correct.
“Q. And based on that, you were able to tell these police officers that your understanding was that he was referring to drugs or cocaine when he talked to you on February 3rd? You had no idea what he was referring to did you?
“A. It was an assumption.
“Q. That was an assumption on your part? That assumption was not based on the use of the term ‘drugs’ or ‘cocaine’ or anything tangible or specific like that, was it?
“A. No.
“Q. And your assumption was based on —that’s what you thought the police officers wanted to hear, wasn’t it?
“A. Yes.
“Q. Now, isn’t it a fact that Steve Anderson — you know Sergeant Anderson, don’t you?
“A. Yes, sir.
“Q. He told you that what they wanted to do was get Mr. Aycock over there so they could search him?
“A. Yes, sir.
“Q. And isn’t it a fact that he said that to you after you made the calls to Neal Aycock?
“A. Before and after.
“Q. Okay. And that was Sergeant Anderson that said that to you?
“A. Yes, sir.
“Q. And Sergeant Anderson is the officer who actually searched Mr. Aycock after he got there?
“A. I have no idea who searched him. I didn’t see the search.
“Q. And you told me that on April 1st too, didn’t you?
“A. Yes, sir.
“Q. And is that the truth? Is that what Sergeant Anderson said?
“A. Yes, sir.
[[Image here]]
“Q. Deborah, how long was this telephone conversation between you and Mr. Aycock? How long did it take place?
“A. Thirty seconds.
“Q. Thirty seconds? I see a quotation from the conversation on Page 4 of the taped statement that you gave to Sergeant Anderson. Let me ask you about that, and I will let you go.
“Do you recall Sergeant Anderson asking you, ‘Okay. And you would tell me about your attempt to contact Mr. Aycock and your resulting conversation?’
*681 “A. Right. I placed a call to his pager and asked him to call me. And a short while later, when he had not returned my call, I called back the second time. -
“Q. Okay. But when you talked to him—
“A. But when I answered the phone he said, ‘Well, how are you doing? Is everything okay?’ And I said, ‘Yes, just fine.’ And he said, ‘Do I need to come see you,’ or, ‘would you like for me to come see you,’ or something to that effect. And I said, ‘Yes, I do.’ And I said, ‘Do you have anything you can bring me?’ That’s exactly what I said.
“Q. Is that all that was said between you and Mr. Aycock?
“A. Yes, sir.
“Q. And is that all that you told the officers that was said between you and Mr. Aycock?
“A. Yes, sir.
“Q. And after that when Sergeant Anderson asked you was it your understanding that that conversation had to do with cocaine, is that right?
“A. As I’ve said, that was an assumption.
“Q. Now, did Sergeant Anderson ask you on February 3rd, before the phone calls to Mr. Aycock, as to whether or not it was your understanding that the conversation that you had with Mr. Aycock concerned cocaine?
“A. Would you repeat that?
[[Image here]]
“Q. Debbie, after you had called Mr. Aycock, you made the statement to Anderson about what was said in that conversation, right?
“A. Yes, sir.
“Q. And do you recall Anderson asking you in the taped statement if it was your understanding about what that conversation dealt with?
“A. Right.
“Q. My question to you is did Anderson ask you about your understanding of the conversation with Aycock before Neal came over there?
“A. Yes.
“Q. Okay. So he had asked you and you answered approximately what’s in this taped statement?
“A. It was immediately after the phone call.
“Q. You told Sergeant Anderson what was said and he asked you if it was your understanding he was referring to cocaine?
“A. That’s correct.
“Q. Okay. And then how long was it after that that Anderson said that he wanted to get Mr. Aycock over there so he could search him?
“A. He said that before that conversation.
“Q. Okay. And did he say it again after the conversation?
“A. All that was said was that we need to get him over here to search him.
“Q. And do you recall whether or not that was said before or after you told Anderson what you understood, what your understanding about the purpose of the subject of the telephone conversation with Aycock?
“A. I honestly can’t remember.”
The next witness in the case, who testified as a witness for the State, was Police Officer Steve Anderson, who was an officer for the City of Florence. We quote from his testimony as follows:
“Q. And are you working in the Vice Unit of the Police Department now?
“A. That’s correct.
“Q. Were you working in that unit on February 3rd of this year?
“A. Yes, sir.
“Q. Did you have an occasion to go to the apartment of Debbie Holland?
“A. Yes, sir.
“Q. That was on February 3rd?
“A. Yes, sir.
“Q. Was that to execute a search warrant?
*682 “A. Yes, sir.
“Q. During the course of your search of her apartment, did you have a conversation with Debbie Holland concerning Neal Aycock?
“A. Yes, sir.
“Q. How did the subject of Neal Ay-cock come up?
“A. Okay. After she was advised of her rights, we had a conversation. The best I remember, I told her that we were interested in her source for cocaine, and that’s when she brought up Neal Aycock.
“Q. What did she tell you about him?
“A. That Neal Aycock had delivered cocaine to her apartment on the day before that.
“A. Was Neal Aycock known to you?
“A. Yes, sir.
[[Image here]]
“Q. Go ahead and tell us what happened.
“A. She further stated that she had gotten to know Neal Aycock through ... while she was an employee of the Fogcut-ter.
[[Image here]]
“Q. Go ahead.
“A. And that Aycock had brought cocaine to her apartment on the day prior, and that she was supposed to contact him again on the day we were to execute the search warrant.
“Q. Okay. Did you ask her to make a phone call to his pager number?
“A. Yes, sir, we did.
“Q. Did she cooperate with you?
“A. Yes, sir.
“Q. Tell us what happened in that regard. What did you ask her to do, and what did she do?
“A. We asked for her cooperation in getting Mr. Aycock to deliver some cocaine, since she had named him as being her supplier. She stated that she could call Neal Aycock by pager, the number she had was a pager, and she indeed did. She dialed the number. She dialed it on one occasion and gave a message for him to call her, and there was no return call. Approximately 30 minutes later, 20 or 30 minutes later, as we were getting ready to leave the apartment with her in custody, she asked to let her try it again, and we did. Some few minutes after she made the second call, she received a phone call. We didn’t listen to the phone call. When she answered the phone, she made indications, pointing toward the receiver, that it was him, and she had a very brief conversation. The conversation started on an exchange of pleasantries, and then she asked a question somewhat to the effect, ‘Have you got something you can bring over?’ And then she hung up the phone. She told us she had been talking to Neal Aycock and he would be over in about 30 minutes.
“Q. Did she tell you he would have anything with him?
“A. Yes, sir. She said that he had mentioned cocaine.
“Q. He had mentioned cocaine?
“A. He had mentioned it, or she understood him to mean cocaine by the conversation.
“Q. So at that point, you changed your plans and stayed at the apartment?
“A. Yes, sir.
“Q. How long did you have to wait?
“A. It was approximately 30 or 35 minutes.
“Q. All right. Are you the one who actually searched Mr. Aycock?
“A. Yes, sir, I was.
“Q. Did you find some cocaine?
“A. Yes, sir.
“Q. Where did you find it?
“A. In this left-front shirt pocket.
“Q. Let me just show you a picture here, State’s Exhibit No. 1, and ask you if that’s the shirt he had on?
“A. Yes, sir.
“Q. Was the shirt pocket snapped shut?
“A. I don’t believe it was.
“Q. Was the flap down?
“A. The flap was down.
*683 “Q. So in order for you to recover the cocaine, you raised the flap, stuck your fingers into the pocket, and pulled it out?
“A. That’s correct.
“Q. Was he in custody at the time you conducted that search?
“A. Yes, sir, he was.
“Q. Was he handcuffed?
“A. Yes, sir.
“Q. I think the picture shows him with his hands behind his back; is that right?
“A. That’s correct.
“Q. This picture was taken at the time you found the cocaine?
“A. Yes, sir.
“Q. So this is the actual picture of the search itself, as far as the cocaine is concerned?
“A. When I found the cocaine we already had camera equipment available. I brought it to the attention of then-Sergeant Crunk and I held it there in that position that it is in in the photographs while he took the picture.
“THE COURT: How much cocaine was that?
“THE WITNESS: It was 6.6 grams, sir.
“THE COURT: How much is that in terms of ounces?
“THE WITNESS: Roughly a quarter of an ounce.
“BY MR. JONES:
“Q. How much is that in terms of street value?
“A. $660.00.”
We now quote from the testimony ¡of Sergeant Anderson on cross-examination:
“Q. Sergeant Anderson, you and the other officers did not listen in on that telephone conversation that occurred allegedly between Debbie Holland and Neal Aycock on February 3rd, did you?
“A. No, sir.
“Q. You were just relying on her word that he was on the other end of the line; is that right?
“A. Yes, sir.
“Q. How long did- that conversation take place between [her] and Mr. Aycock, in your best judgment?
“A. In my judgment, I would say less than a minute.
"Q. And you in fact didn?t know for a fact that Neal Aycock was actually coming over there, other than what Debbie Holland told you?
“A. No, sir.
“Q. And you in fact did not know that Neal Aycock was bringing cocaine or any other kind of drug over there, other than what Debbie Holland told you?
“A. No, sir.
“Q. And your purpose in searching Mr. Aycock was to try to locate some drugs or cocaine, wasn’t it?
“A. Yes, sir.
“Q. Now, you stated earlier — let me withdraw that and ask you this: There’s been a taped statement or a typed up statement of a taped conversation that occured between you and Debbie Holland after Mr. Aycock's arrest on February 3rd.
“A. Yes, sir.
“Q. Do you recall taking that statement from her?
“A. Yes, sir.
[[Image here]]
“Q. And does this statement represent essentially all that Debbie Holland told you there in her apartment regarding Neal Ay-cock before the telephone calls to him?
“A. Essentially, I believe it does.
“Q. Okay. Now, in your testimony, you mention that after Debbie got off the phone, she either mentioned coke or stated that she understood Mr. Aycock was referring to coke in the conversation?
“A. That’s right.
“Q. Which was it?
“Q. If I can remember her statement to us, she said he would be there in about 20 minutes and he would have it with him, ‘it’ being understood as being cocaine.
“Q. All right. Did you ask her there before the phone call to Mr. Aycock the *684 same question you asked her in the typed statement, ‘Was it your understanding, based on the text of the conversation, that it was concerning cocaine?’
“A. I don’t remember asking her that but it seems like as best I remember, that she hung the phone up and said that was him and made this statement.
“Q. Made the statement that he was bringing cocaine, or that it was her understanding that he was bringing cocaine, or that the subject of the conversation concerned cocaine?
“A. That the subject of the conversation concerned cocaine.
“Q. So she never mentioned or stated the word ‘cocaine’ to you before Mr. Ay-cock got there?
“A. Many times.
“Q. Never in the context that Mr. Ay-cock was bringing cocaine over there and had said so in that conversation?
“A. After the conversation.
“Q. Before Mr. Aycock got there, after the conversation?
“A. Yes, sir. We may have discussed cocaine. We had quite a bit of time to wait, and I don’t recall really what all we did discuss.
“Q. Regarding the gist of the telephone conversation that Debbie Holland told you occurred between [her] and Neal Aycock there on February 3rd, regarding that conversation, told you that Mr. Aycock stated the word ‘cocaine’?
“A. No, sir.
“Q. And she never told you that he said he was bringing cocaine over?
“A. Not that I remember.
“Q. On the contrary, the only thing she told you was her understanding from what she said between the two of them, that he was referring to cocaine in the conversation; is that true?
“A. I really — I don’t understand your question.
“Q. Well, the only thing she told you [was] that it was her understanding ... Mr. Aycock referred to cocaine in the conversation?
“A. That’s correct.
“Q. Okay. And the conversaton she’s referring to is the one in which she asked him how everything was, and he said it was fine, and do I need to come to see you, and she said, ‘Yes. Do you have anything you can bring me?’ and he said, ‘I’ll be there in about 30 minutes’; is that right?
“A. Yes, sir.
“Q. Did you know Deborah Holland before February 3rd on a personal basis?
“A. I knew her on a professional basis.
“Q. Did you ever talk to her?
“A. Yes, sir.
“Q. How long had you known her on February 3rd?
“A. I had talked to her several months prior to that occasion.
“Q. Did you talk to her on one occasion in a conversation several months before February 3rd?
“A. I talked to her on several occasions.
“Q. Had she ever given you information before February 3rd that you could use as a basis for a search or arrest warrant?
“A. Not that I used as a basis for a search or arrest warrant, no.
“Q. Had she ever given you any information that you had used as a basis to arrest someone else before February 3rd?
“A. No, sir, not to make an arrest.
“Q. So she had never been what you call an informer or anything of that nature working for the police department before February 3rd?
“A. She had supplied some information concerning other criminal activities.
“Q. Okay. But nothing that you would actually use for probable cause to get a search or arrest warrant?
“A. Not a search or arrest warrant, no, sir.
“Q. Would you believe Deborah Holland under oath?
“A. Yes, sir.
“Q. Would you condition that? I mean, would you believe her under oath, or would *685 it depend on the circumstances and conditions she was under?
“A. I would believe her.
“Q. In any respect?
“A. Under—
“Q. Did you tell Deborah Holland that you really wanted to get Neal Aycock over to her apartment on February 3rd so you could search him?
“A. I don’t remember saying specifically so that we could search him. I do remember the gist of the conversation was to see if you can call him and see if you can get him to deliver some more cocaine.
“Q. Did you ever tell her that the reason you wanted him to get over there was so you could search him?
“A. I may have mentioned it.
“Q. If you said it, you don’t remember it?
“A. That’s possible.
“Q. If Deborah Holland just testified that you did say it, would you deny that?
“A. No, sir. I wouldn’t [deny] it. I just don’t remember it specifically.
“Q. And is that in fact the real reason you wanted to get Neal Aycock over to her apartment, so you could search him?
“A. If he was indeed bringing cocaine as she stated.
“Q. You said you wanted to get him over there to search him if he indeed was bringing cocaine with him?
“A. Yes, sir.
“Q. Well, if he had walked in the door and you had asked him if he had any cocaine and he had said no, does that mean you wouldn’t have searched him.
“A. No, sir.
“Q. Did you search his car?
“A. I didn’t.
“Q. Was his car searched?
“A. Yes, sir.
“Q. To your knowledge, was any other drugs, cocaine, whatever, found in his car?
“A. No, sir.”
The testimony last quoted above constituted the end of the testimony on the defendant’s motion to suppress, whereupon the trial court ruled, “The motion to suppress is denied, the case is set for trial June 9, at 9:00 a.m.”
The writer hereof regrets that so much space had to be taken as to appellant’s second issue, but it is believed that such was necessary in order to present fully everything that was said or done in favor of appellant as to this issue. We believe that the answer to the contention of appellant as to the second issue is to be found in the previously cited opinion of Tyson v. State, from which we now quote a portion as it is reported at 361 So.2d at page 1186 as follows:
“The defense of entrapment is not applicable where the law enforcement officer merely affords an opportunity to one intending to violate the law. Johnson v. State, 36 Ala.App. 634, 61 So.2d 867 (1952); Boswell v. State, 290 Ala. 349, 276 So.2d 592 (1973); Mullins v. State, 56 Ala.App. 460, 323 So.2d 109, cert. quashed, 295 Ala. 412, 323 So.2d 116 (1975). ‘It is only when the Government’s deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.’ United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). The primary focus is on the predisposition of the accused rather than on the agent’s action. Russell, supra.
“ ‘The cases considering the defense of entrapment in prosecutions for offering or paying bribes support the conclusion that the defense cannot be successfully interposed when the accused initiates the transaction by offering or suggesting payment of a bribe, and law enforcement officers, public officials, or others to whose conduct the doctrine applies, thereafter pretend to cooperate by furnishing or otherwise aiding the completion of the offense for the purpose of prosecuting the accused or obtaining necessary evidence.’
“ ‘[T]he defense is established where government officials, or persons acting under their direction, for the purpose of arresting and prosecuting the ac *686 cused, first request, demand, or suggest payment of a bribe from an otherwise innocent person who apparently did not previously have the intention or design to commit the offense, and the accused, either because of fears of official retaliation or the persuasion and representation of the agents, was lured or induced into committing the offense.’ Annotation: 69 A.L.R.2d 1396, 1400, 1401, (I960).’ ”
In accordance with what we have just quoted from Tyson v. State, and after thorough consideration of what was held in that case, that “the primary focus is on a predisposition of the accused rather than on the agent’s action,” we are of the opinion that neither issue presented by appellant is well taken.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All Judges concur, with BOWEN, P.J., concurring in result only.